UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **Plaintiff,** | : | Criminal Action |
| | : | No. 1:24-cr-00180-PTG-2 |
| **v.** | : | |
| | : | Court of Appeals |
| **RYAN MACAULAY,** | : | No. Appeal No. 25-4547 |
| | : | |
| | : | |
| | : | September 25, 2025 |
| **Defendant.** | : | 11:09 a.m. |
| | : | |
| .............................. | : | |

**TRANSCRIPT OF SENTENCING PROCEEDINGS**
**BEFORE THE HONORABLE PATRICIA TOLLIVER GILES,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the United States:   **Kristin S. Starr, Assistant United States Attorney**
DEPARTMENT OF JUSTICE
UNITED STATES ATTORNEY'S OFFICE
2100 Jamieson Avenue
Alexandria, VA 22314
DOJ-USAO
703-299-3700
Email: Kristin.Starr@usdoj.gov

For the Defendant:   **Daniel Hutcheson Goldman, Esq.**
THE LAW OFFICE OF DANIEL GOLDMAN, PLLC
421 King Street
Suite 505
22314
Alexandria, VA 22314
202-677-5709
Fax: 833-523-2310
Email: Dan@dangoldmanlaw.com

APPEARANCES:   (Cont.)


Court Reporter:                    **Scott L. Wallace, RDR, RMR, CRR**
                                   Official Court Reporter
                                   United States District Court
                                   401 Courthouse Square
                                   Alexandria, VA 22314-5798
                                   Cell: 443-584-6558
                                   Email: Scottwallace.edva@gmail.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

**MORNING SESSION, SEPTEMBER 25, 2025**

(11:05 a.m.)

THE COURT:  The Court calls United States of America versus Ryan Macaulay, Case 1:24-cr-180.

May I have appearances, please, first for the government?

MS. STARR:  Good morning, Your Honor.  Kristen Starr on behalf of the United States.

THE COURT:  Good morning, Ms. Starr.

MR. GOLDMAN:  Good morning, Your Honor.  Dan Goldman on behalf of Mr. Macaulay, who's present.

THE COURT:  Good morning, Mr. Goldman.  Mr. Macaulay, you were not here last time.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  What happened?

THE DEFENDANT:  I was misinformed about the start time -- of the start time.  It was 10 a.m. instead of 9 a.m.

THE COURT:  It was on your presentence report, okay?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  The time, that's for you to learn and for you to know.  Understood?

THE DEFENDANT:  Okay.

THE COURT:  And so we're on today for sentencing, Mr. Macaulay having pled guilty to Count 1, which was conspiracy to commit bank fraud; Count 5, which was bank fraud; Count 7, conspiracy to commit money laundering; and Count 11, money

laundering, unlawful monetary transactions.

Mr. Goldman, have you had an adequate opportunity to review the presentence report with your client?

MR. GOLDMAN:  Yes, Your Honor.

THE COURT:  And Mr. Macaulay, sir, have you had an adequate opportunity to review the presentence report with your attorney?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And is there any reason why I shouldn't proceed with the sentencing today.

THE DEFENDANT:  No, Your Honor.

THE COURT:  Thank you, sir.  You may be seated.  And again, the appropriate victim notifications went out?

MS. STARR:  (Nodded head affirmatively.)

THE COURT:  All right.  So let's start with our -- I know there are objections, and we'll get to those in a moment.

And I will say, the counts group for purposes of calculating the guidelines.  The presentence report currently reflects a base offense level of 7; then a 16-level increase for the amount of loss being more than 1.5 million but less than 3.5 million.  There's a two-level -- although this has been -- Well, I'll just go ahead and give it for now because it's reflected in the presentence report -- a two-level increase based on the defendant deriving more than 1 million in gross receipts. I believe that that has been conceded by the government.

MS. STARR:  That's correct, Your Honor.

THE COURT:  So I won't even -- so that one is going to come out, okay?  And then a one-level increase for the conviction under Section 1957.  That's that money laundering; two-level increase for the adjustment for role in the offense.

That resulted in an adjusted offense level of 28, and then a two-level decrease for acceptance, which resulted currently as the 26 that's reflected in the guidelines.  I'm just going on what's currently reflected here.  It was a Criminal History Category 1, because of zero points, and that yielded an advisory guideline range of 63 to 78 months, a supervised release range for Counts 1 and 5 of two to five years, and Counts 7 and 11 it's one to three years.  And then the fine amount range for each of the counts is 25,000 to 1 million, and then a $400 special assessment, $100 per count of conviction.

And so with those calculations, the government -- do you have any objections?  Is it only to the one million?

MS. STARR:  Yeah.  Essentially, we withdraw our objection to that and concede that that would be it.

THE COURT:  Okay.  And so, Mr. Goldman, I'll take up your objections at this time.

MR. GOLDMAN:  Thank you, Your Honor.  And, Your Honor, I will not belabor the point.  I rest largely on our papers today.

THE COURT:  Okay.

MR. GOLDMAN:  But I will say, in doing some additional --

our position is that Mr. Macaulay did not direct anyone within the conspiracy.  The government points to Ms. Macaulay, his wife, as someone that he asked to sign a document, had her sign a document during the course of this and return money to the business.  She was not a knowing participant in the conspiracy. She was never charged with criminal conduct.  She received a witness, rather than a target letter.

THE COURT:  You don't have to be convicted or charged with criminal conduct to be considered a participant, correct?

MR. GOLDMAN:  To be considered -- but she has to be criminally liable in order to be a member of a criminal conspiracy.  She has to have some knowledge, because, in order to have participated in this --

THE COURT:  And the knowledge wasn't when she's getting checks in her name for work that she's not committing or doing? Is that not knowledge?

MR. GOLDMAN:  Well, she did -- our position is she did do some work for the business.

THE COURT:  But not for the full amount for what she was being --

MR. GOLDMAN:  It's our understanding that she received a single check for work that she did in setting up a Website and looking into setting up an app -- a Web-based app for the business, and for this she received that and it went back into the business.  But --

THE COURT:  And then a sister-in-law, right?

MR. GOLDMAN:  Her sister-in-law, who was also an employee of the business and a co-owner of the business in a similar position, also did -- received money for work that she did and money that was, our position, justifiably paid to her initially, although she did then turn that back into the business.

THE COURT:  Okay.  I understand your position.

MR. GOLDMAN:  Okay.  I will just note, in terms of the sort of role in the offense, as I was going through all of the FBI 302s in this case -- I was reviewing 120 pages of FBI 302s, and much of it has to do with distinguishing Mr. Macaulay from Mr. Rahbar.  Mr. Rahbar's name is mentioned 650 times throughout the course of that.  Mr. Macaulay's name is mentioned 50 times throughout the course of the 120 pages.

I think it's also relevant to note that Mr. Pierre, his name was mentioned 350 times during the course of that.  No one in that -- in any of those reports made a statement, either in grand jury or in the 302 interviews that Mr. Macaulay directed them to do any criminal conduct.

Everyone ascribed the direction to Mr. Rahbar.  So that, I will simply state that that's our position on that.  Our position is that that should then bring his level down by two points, which would allow him to also get the -- get the benefit of the zero point offender on that.

So that is our point there on the greater than 1 million,

which we laid out in our papers.  The government concedes that, so I won't argue that to Your Honor.

As far as the loss amount, Your Honor had the same argument in front of you just moments ago.  Our position is that there were legitimate expenses that were expended, and that should bring his loss amount down by roughly $530,000 to about $1.4 million.

I think he's differently situated than Mr. Rahbar. Certainly as to the rent, the $130,000 in rent that was paid, they did need to have some sort of a headquarters.  That money was paid to Mr. Rahbar, but it was not paid to Mr. Macaulay.  He was also was not in a position to direct where any of that money was spent, the money that was paid to employees, and there were a fair number of employees which the government concedes were legitimately paid.  And when we add those up based on the numbers stated in the 302s, we come to a rough calculation of about a $530,000 reduction, which would bring it down to 1.4 million.

So that's our position as to the loss amount.

I also adopt the arguments that were made previously by co-defendant counsel about that.  Nevertheless, our position is that he -- his loss amount should be in the $1.4 million range below the 1.5 range.

THE COURT:  Okay.  All right.  Ms. Starr.

MS. STARR:  Thank you, Your Honor.  And I know during Mr. Rahbar's sentencing I referenced a case, and I, during the

break, did get a copy of that case just for chambers to have, and I provided that case to Mr. Goldman.

I don't plan to rely on it here due to the surprise element, but in order to be fulsome with my presentation, I know the Court wrote it down, but I did bring a copy of the case for you to just take a look at it another time.

THE COURT:  Okay.  Thank you.  And I appreciate that.  And I think I was clear in my ruling.  I wasn't saying that you were wrong, just that it hadn't been established.

MS. STARR:  Fully understand, and I just wanted to make sure that I got that for you so you have it.

And I understand that.  And the one thing I would just note on that element is, it is straight from the guidelines themselves, that loss is the greater value versus intended loss, so.

THE COURT:  Okay.

MS. STARR:  But, you know, this was a case that further held -- that said again, for the purposes of making sure everybody has fair notice, I'm not going to rely on that case.

THE COURT:  Right.  But when we -- when you're talking about -- because they did make that argument in their papers, actual versus intended, but the balance of the argument has to deal with whether or not, when you have certain legitimate -- how to parse it out and what is considered the loss.

MS. STARR:  Correct.

THE COURT:  And the expens- -- does this case speak to that?

MS. STARR:  You know, Your Honor, I don't think it goes into -- there is some discussion of that, but I don't think in a fulsome enough matter that I would rely on it in terms of addressing my argument here.  I think here, you know, this is more of a fact-specific inquiry, and I think it's -- it -- in terms of whether or not they're legitimate expenses.

Again, that is a question for forgiveness.  That is not a question about how you get the loan.  And so that is why, at a fundamental level, the government does not believe it's an appropriate way for them to then look at loss.

Those figures -- you know, a lender wasn't looking at what they projected their loss to be.  The rules were that you needed to spend at least 60 percent on payroll, and then you had 40 percent for other approved business expenditures in order to obtain forgiveness for the loan.  But it's not whether or not you get the loan and how much you get the loan for, so it just seems fully beside the point and improper to then discount loss after the fact.

If that -- because the only thing that business owners could do under the program terms -- and many did -- was just decide, we have cash strapped businesses; this is a 1 percent interest rate loan, and we're happy to then repay the loan per

the terms of the note that was issued at the time, and we will use this as a infusion of cash for our business, and they could have done that.  They could have said, you're right, we don't qualify for forgiveness, but we'll pay it back with 1 percent interest.  So to now say that the loss should be discounted --

THE COURT:  Well, I think they're saying, the expenditures that you send out go to what can be forgiven --

MS. STARR:  -- correct --

THE COURT:  -- not necessarily --

MS. STARR:  -- what you get in the first instance.

THE COURT:  Where is that?

MS. STARR:  It's in the SBA guidance itself, Your Honor --

THE COURT:  Okay.

MS. STARR:  -- which is voluminous.

THE COURT:  Right.  The next time, you may want to highlight and walk the Court through something like -- ahead of time so that --

MS. STARR: -- absolutely --

THE COURT REPORTER:  I'm sorry.  I'm sorry.

THE COURT:  To highlight for me, you know, and then walk the Court through that, because to get it once we arrive is not helpful because it's also -- does not give Mr. Goldman or, you know, the defense an opportunity to respond to that, you know?

MS. STARR:  Understood, Your Honor.  And I will say that there were presentations given to Mr. Rahbar's counsel.  It

wasn't to Mr. Goldman because he was not counsel at the time, but to Mr. Macaulay and Mr. Rahbar about the program and its terms and where this type of, you know, expenditure would have come in in terms of relevance, but it is on the face of the program that all they cared about in the issuance of the loan was payroll.

And then I would just note, in terms of Mr. Macaulay's argument here, Mr. Macaulay needs it to be $530,000 to get below that 1.5.  They're right at that level, and they really need it to be exactly that amount to drop down to the next level.

And a lot of that in his argument relies on this issue of rent, and, you know, his submission here today that these individuals needed a place to go to work.  Everyone needed a place to go to work during the pandemic that wasn't an office.  Many of us, if not all of us, worked from our homes.  This was Mr. Rahbar's home.  I did not pay rent to my home.  I don't think most people who worked from home paid rent to their home, and particularly when we're talking about, which has been much talked about today, a start-up that was struggling.  It seems a bit hard to believe that he should be paying rent to a business he was already, by his own account, putting a lot of his human and actual capital into.

So it just doesn't seem appropriate, then, to give him a discount for loss amount when it shouldn't have been there in general, but then largely based on rent, which was out of his business partner's home.

And, again, the witness's testimony is that there still was an ability to use this space that they had a lease on.  The only reason they weren't able to go into the space in Chinatown where the gym was to be was not because of COVID or distancing or any of that, but because they had stopped paying rent on it.  So the only reason there was a need even to find another location was because they weren't paying rent on their actual gym location.

Additionally, again, to the extent this relies on salaries for individuals, we interviewed nearly 50 employees, employees of Beyond FIT.  None of them actually worked for the business.  There was much discussion about Andrea Macaulay.  Her testimony was that she thought she was doing pro bono work for the business at the time and did not expect to get paid for her work; that as -- at the time Mr. Macaulay's spouse -- she was helping him out with a business venture.  So, you know, any kind of payments as it relates to her doesn't seem appropriate to then debit out either, even if we were to get there.  So that is, you know, the government's argument as it pertains to loss amount.

Moving on to leadership.  I know this one is, you know -- Mr. Macaulay is in a different situation from Mr. Rahbar.  He also just doesn't have the benefit of a plea agreement here.  But Mr. Macaulay's arguments to the government seem to show that he's still not taking proper responsibility for his actions and the role in this offense.

While he may have just identified in his own mind that this was Mr. Rahbar's doing, the evidence suggests otherwise. Mr. Pierre testified at length that the meetings were always -- about the PPP loans -- were always between Mr. Rahbar and Mr. Macaulay, and that is supported by the fact that those are the two names repeatedly on PPP loans, and that those two people are the only two that e-mail in regards to bank communications about the PPP loans.

Mr. Pierre is never included in those e-mails, nor is anyone else. Individuals, when they spoke about the leadership of the company, spoke about Ryan and Raymond together, almost always.

I did not "control f" to find the references, the number of references, so I can't speak to that, but, you know, in -- for example, in BF Chinatown, the entity that really was Beyond FIT, Mr. Pierre had only a 5 percent stake in the company. Mr. Macaulay had a 35 percent stake. And the only other name we see appear on the applications, setting aside the applications that don't apply to Mr. Macaulay and only apply to Mr. Rahbar, is Andrea Macaulay.

And while it might have been Mr. Rahbar who had the idea to put Andrea on as an owner of a business, because she was both put down both as an owner and then also -- she was made an owner separate and apart from also being listed as an owner on a PPP application. She wouldn't have done this, and she wouldn't have

been in a role to do this without Ryan.

He abused the position of trust as her spouse knowing that she would do and say and sign what he asked without question, which she, herself, testified to.

He recruited her in and she did not -- she admitted that she did not think she was a paid employee.  He also brought in his sister-in-law.  These people had no independent relationship with Mr. Rahbar.  And Ms. Medland, the sister-in-law, did not have any ownership in any of these businesses.  She was simply brought in to be listed as a PPP as part of the payroll, and she did receive money at the direction of Mr. Macaulay.

THE COURT:  Well, they said that she received money for work that she did.

MS. STARR:  And we have no evidence of any of that work. We have many witnesses who have -- we've asked, Who did you see in the business at various times?  To the extent you could establish who employees were, her name never came up.

There were a couple of fitness trainers who came up, Mr. Macaulay, Mr. Rahbar, Mr. Pierre, a trainer.  You never saw the name of Ms. Medland.

So, to the extent there was any work done, it was not aware to other individuals who admittedly did work for the company.

And, as far as it goes in terms of the target letter issue, I think, as Your Honor is well-aware, a target letter is

not dispositive of criminal liability, whether or not she received a target letter or not. It was the government's position that she did have culpability and exposure, which is why she was granted immunity for her testimony in this case.

I know, and I'll touch on, and this case comes up again, the *Mr. McGhee* case -- not Maggie, it's McGhee -- and Mr. Gilcher. And defense counsel points a lot to Mr. Gilcher's role vis-à-vis Mr. McGhee to compare Mr. Macaulay.

There, Mr. McGhee was the head of everything, admittedly. He mastermind the entire scheme. There was never an attempt to get a leadership role as to Gilcher.

There is a similarity in that he was also in charge of technology, so I understand the desire to compare the two, but he was not public-facing in the gym facility that served as the main source of their PPP fraud scheme in that case.

Here, Mr. Macaulay and Mr. Rahbar were presenting a united face on this company.

And so we see that as a fundamentally different role and that, given Mr. Macaulay's involvement of his then wife, his sister-in-law, and his communications with Mr. Rahbar as the only other individual discussing the PPP lending process itself, that he is properly assessed a two-point increase for his leadership.

THE COURT: Okay. I'm going to follow-up on this one some, because you said something that kind of struck me a moment ago when you said that, if the sister-in-law -- you had no

evidence of there being work that she had performed, but that's almost like a negative --

MS. STARR:  I understand.

THE COURT:  -- when the burden is the government's to prove that these two people were -- I think, to qualify as a participant, they have to be knowledgeable participants.  They may not know the ins and outs of everything, but they're not -- the Court needs to have an indication of enough that they are aware that something is afoot.  And so, if she's doing work and gets a check, how can the Court perceive that as being her being aware.

MS. STARR:  I appreciate you bringing that up, and I think there's something very illustrative on that point.  The records show that Mr. Macaulay paid Ms. Medland, the sister-in-law, $44,000 over the course of this scheme directly from the results -- from the proceeds of PPP funds.

Within days of her receiving each of those payments, because that was in total, she received money from both the 2020 loans and the 2021 loans.  Every time she received an amount of money from Mr. Macaulay, within days it was sent back to him and went back to his personal account.

THE COURT:  And how much was given to his wife?

MS. STARR:  I don't have an account -- I believe it was only one check, and I can't remember the amount offhand, Your Honor.  I apologize for that.

12 is my memory, and Mr. Goldman agrees, so I think that sounds about right. And I will also note that, while Ms. Medland was paid $44,000, our accounting shows she sent $46,000 back, and I don't know why she would be paying Mr. Macaulay extra money for work she did.

THE COURT: Okay. Thank you.

MR. GOLDMAN: Your Honor, if I might just address a couple of those points briefly. The only evidence that I was able to find regarding Ms. Medland's employment status was her own statement to the FBI where she described herself as an employee of the company, worked for the company in 2020, over the course of a year received checks as compensation, signed up for payroll platform but was paid by check and was paid from all three Beyond FIT entities.

So, as far as I understand, the only evidence in the record is the -- the only piece of evidence in discovery is that she was an employee or at least believed she was an employee. That's what she represented to the FBI when she received that compensation.

I will also note that Mr. Macaulay didn't pay Ms. Medland. Beyond FIT paid Ms. Medland, and Mr. Macaulay himself did not have control over the payments that were coming out of Beyond FIT.

Mr. Macaulay himself didn't keep any money from any of the loans. All the money that he received went back into the Beyond

FIT entities, and I recognize that that -- I recognize the government's argument and the law that that is not a legal purpose for him to send that money back, but it is, I think, relevant, at least, under the nature and circumstances of the offenses; that this is an individual who did not, himself, personally profit from this at all.

The 302s --

THE COURT:  That doesn't really persuade me.

MR. GOLDMAN:  Pardon me?

THE COURT:  I said that doesn't really persuade me, because they're still taking money that they are not entitled to, and the government is not their investor.

MR. GOLDMAN:  I agree.  I understand the Court's position on that.  But I will say that, in terms of the employment, as far as Ms. Medland and Ms. Macaulay both being employees, both told the FBI during the interview that they were employees and they were paid as employees.

So I think that's the only evidence, and it is the government's burden to show otherwise.  So, to that point, I would say -- that's all I would say on that.  I would also say that, as to the point about Mr. Pierre, the government is representing that Mr. Pierre -- that the PPP loan discussions only happened between Mr. Macaulay and Mr. Rahbar, but in Mr. Pierre's own statements he said he never spoke about PPP loans with Mr. Macaulay, and only spoke with them himself with

Mr. Rahbar.

So Mr. Pierre and Mr. Rahbar spoke about the PPP loans and about the proceeds and about how to get those loans.  Mr. Pierre never spoke about that with Mr. Macaulay.

And while we are conceding that Mr. Macaulay himself did speak with Mr. Rahbar about these things, he agrees.  He accepts responsibility.  He did speak with Mr. Rahbar about this.  But no else in the entire case, of all the people that they interviewed, said that Mr. Macaulay spoke with them about the PPP loans.  So our position is that he is not participating -- he is not directing anyone else in a conspiracy in any way.  Thank you.

THE COURT:  Thank you.  Okay.  So, with respect to these objections -- so we've already said that the objection with respect to the defendant deriving a million, that has been conceded.  So that objection is sustained, and paragraph 49 -- so that one will be removed.

With respect to the loss amount, I'm going to sustain that objection for the same reasons I sustained it the first time. I'm not saying that you are wrong, but I'm saying that what you have provided, you have not carried your burden here.

And so I'm going to change paragraph 48 to -- applying 2B1.1(b)(1)(H), and so that would be a 14-level increase instead of a 16-level, okay?

All right.  Okay.  So we have -- the last objection goes with this role enhancement, okay?  And under 3B1.1(c), "to

qualify for adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."

And the application note indicates, "a participant is a person who is criminally responsible for the commission of the offense but may not have been convicted."  And it gives a -- note 4 gives a number of factors for the Court to consider, including the exercise of decision-making authority, nature, participation in the commission of the offense, recruitment of accomplices, the claim right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."

Some of these factors, I think, do weigh in favor of showing he had some type of role, but I'm not so sure that we have enough here to place Mr. Macaulay on the same equal footing as Mr. Rahbar, because, essentially, in the materials that you provided, it's based on the wife and the sister, correct -- sister-in-law?

MS. STARR:  I think that's essentially right.  I would say it goes a little beyond that versus Mr. Rahbar and Mr. Macaulay sitting above Mr. Pierre and even the rest of -- the other four or so individuals who worked for the company.

MR. GOLDMAN:  Your Honor, if I may just on that point. Mr. Pierre also had family members who were -- a brother who --

THE COURT:  Mr. Pierre is in a whole different position --

MR. GOLDMAN:  -- I understand --

THE COURT:  -- because he pled guilty and got some other benefits --

MR. GOLDMAN:  I understand.

THE COURT:  -- early, and so --

MR. GOLDMAN:  I understand.

THE COURT:  -- it's not even the same -- and had a different position in the company.

I don't -- but I do think it's not only these checks, it's the fact that, with respect to his wife, he had her not fill out application documents but had her signing documents.  Is that accurate?

MS. STARR:  That's completely accurate, Your Honor.  She says that she did not fill them out, and she signed them at Ryan's behest.

THE COURT:  And brought her in.  And she's also -- and to be a part owner of one of the entities.

MS. STARR:  Correct.

THE COURT:  So that is something different.

MR. GOLDMAN:  I would just point out --

THE COURT:  I'm not going back and forth now.  I'm ruling. I think, given that, I think, given his amount of ownership in the entities and, I think, his involvement with his wife and his sister-in-law, even if she says in that 302 that she was an

employee, the fact that she returned more money than she would have been paid, and the quickness with which she returned it, leads the Court to find that she knew something was afoot here and that she was not some typical type of employee for a company.

So I'm going to overrule your objection with respect to the objection to the role adjustment.

So, with that, the resulting offense level is going to be a 22, instead of a 26.  Okay?  Criminal history remains 1.  And so the resulting guideline range is now 51 -- 41 to 51 months. And so with these changes, I adopt the balance of the presentence report.

Let me just make sure it doesn't change our fine range.

UNIDENTIFIED PROBATION OFFICER:  Your Honor, it does to 15,000.

THE COURT REPORTER:  I'm sorry.  I'm sorry.  I can't hear you.

THE COURT:  She said, "it does, to 15,000."  Thank you.

And so that will be page 19, and that's for each of those, it will be 15, instead of the starting being the 25.  Okay?

And so I find the balance of the presentence report with these changes is correct, and I adopt those.

And just to be clear, the adjusted offense level is now 22, the criminal history category remains 1, and the guideline range is 41 to 51 months.

I'll hear first from the government as to sentencing.

MS. STARR:  Thank you, Your Honor.  Your Honor, after ruling on the objections, removing the enhancement for the $1 million in personal gain, redoing the loss amount category, it's the government's position that the guidelines are hardly overstated for Mr. Macaulay's conduct, and a guideline sentence at the low end of the guidelines, respecting the sentence that the Court handed down for Mr. Rahbar, is appropriate.

The loans that Mr. Macaulay did not have a stake in were removed, and the leadership enhancement properly reflects his role in this scheme.

Again, just briefly to review the nature and circumstances of the offense, Mr. Rahbar and Mr. Macaulay, and Mr. Pierre cofounded the start-up gym named Beyond FIT.

Mr. Macaulay, by everyone's account, was Mr. Rahbar's chief lieutenant, the price vice president to his president. When that business began to fail, Mr. Macaulay and Mr. Rahbar turned to the Paycheck Protection Program to launder -- to obtain funds, treating it as venture money in their start-up.

To fraudulently obtain the loans, Mr. Rahbar and Mr. Macaulay applied for PPP loans in the name of a series of shell companies, one of which Mr. Macaulay had his former wife take an ownership stake in, and he did that to -- as they believed it would further insulate the two of them from liability.

Mr. Rahbar and Mr. Macaulay represented these companies,

had dozens of employees, listing up to 54 on one application.

Most of these people listed as employees were friends and family members of the defendant and Mr. Rahbar, including Mr. Macaulay's former wife and sister-in-law.

Again, as the Court has heard, some of these individuals, many of these individuals were college students who gave their personal information over to Beyond FIT in hopes of obtaining an internship or postgraduation employment.

Either way, virtually none of these people worked for Beyond FIT, none of them received salaries of a hundred thousand dollars, and none of them gave Mr. Rahbar or Mr. Macaulay permission to use their information to apply for PPP loans.

Once they got the funds, Mr. Rahbar and Mr. Macaulay sent out the money, not always using the payroll processor Gusto, but through checks to their friends and family members.

After that, Mr. Rahbar and Mr. Macaulay asked these people to send most of that money, if not all of that money, and in the case of Ms. Medland, more money back to Beyond FIT so that they could -- so Mr. Rahbar and Mr. Macaulay could spend the money as they see fit.

As the company was failing and Mr. Rahbar and Mr. Macaulay faced in increasing pressure to pay their business partners, instead of realizing that the writing was on the wall, Mr. Rahbar and Mr. Macaulay caused the business to continue to take out loans and even file for bankruptcy.

By all accounts, Mr. Macaulay, this is a distinguishing event or series of events in Mr. Macaulay's life, but that, by no means, negates the harm here or means that a significant sentence of incarceration isn't warranted.  Mr. Macaulay continued to down this path for approximately two years with Mr. Rahbar, taking out both first and second draw PPP loans.

As the Court correctly pointed out, this was no singular aberration.

And Mr. Macaulay provided additional documentation to the Court in terms -- in the form of numerous job reviews.

In fact, the job reviews, to the government, illustrate that Mr. Macaulay was no dumbly, he was no pawn for Mr. Rahbar. His character references support this.  His former wife talks about the responsibilities he took on early in life, having been in the workforce since he was a teenager.

It talks about his strong desire to become a successful entrepreneur.  His job reviews talk about his excellent leadership skills, his excellent job communicating with other teams, including technical and nontechnical people.  One manager described Mr. Macaulay as one of the rocks that I rely on due to his professionalism, expertise, and trustworthiness.  This was not someone who was under Mr. Rahbar's thumb, and this is not someone who didn't know better.

Of vital importance to deter fraud in government -- of vital importance is to deter fraud on government programs.

While Mr. Macaulay may not be inclined to do this again, this sentence must serve as a warning to others that if you defraud the government, if you use the government as a source of investment funds, you will be punished, particularly when you defraud a program that was geared towards helping business owners during an unprecedented time and need.

Crimes like this, where the money was carefully laundered to make it appear legitimate or, in some ways, more pernicious than they are, as they are more difficult to root out and more personally calculated for personal enrichment, even if they don't result in luxury purchases.

Every dollar that went to an undeserving business or every extra dollar that went to a business that fraudulently claimed payroll figures prevented thousands of other eligible small businesses from receiving any funds at all, and this program didn't have unlimited funds.

As I pointed out earlier, in terms of disparity, Mr. Gilcher, despite the defenses's argument, is not a good benchmark.  And we must take each defendant as it comes.

This defendant, the government can find no similar comparator role where they -- where a defendant asked his former wife to take such an interest, to sign PPP funds, and also sent extensive amounts of money to her and a sister-in-law and then had those people pay the money back to him.

So, for those reasons, Your Honor, the case is not

similarly situated to Mr. Gilcher, and it would be appropriate for the Court to hand down a guideline sentence.

THE COURT:  Mr. Goldman.

MR. GOLDMAN:  Your Honor, we are certainly not arguing that Mr. Macaulay is not a smart man.  He has been an excellent employee, as evidenced by his performance reviews.

He -- however, he did trust his friend, his long-time friend, Mr. Rahbar.  He did look up to Mr. Rahbar.  And he did follow Mr. Rahbar down this path.

He did not devise this scheme, but he participated in it.  He fully accepts responsibility for his participation in this scheme.

He did not recruit his wife into any kind of a scheme to do this.  He, in fact -- her name on the ownership documents happened before the loans.  He did give her a document to sign for the PPP loans at Mr. Rahbar's direction, which Ms. Macaulay, herself, in her statement says was at Mr. Rahbar's direction, not as Mr. Macaulay's direction.

He has been an exemplary employee.  He worked for the State Department, he has been a patriot, he has been a lover of this country, and he has done great work and served his family and those around him.  He is a kind, decent man, a loving father to two young sons, a caring son to his ailing mother, who's present here in the courtroom.  He maintains a good relationship with his wife at this time despite their separation.

These circumstances, his actions here, have destroyed his life in many ways, personally, financially, and has had a negative impact going forward for his career prospects for the rest of his life.

He is humbled.  He's ashamed of what he's done.  I think his letter that he provided to the Court speaks volumes about his character, about the person that he is, and how he feels about this situation and what he did.

I will say that, while I think the government makes too much of drawing Mr. Macaulay closer to Mr. Rahbar in this scheme. I think that Mr. Rahbar, by all accounts, was the clear leader and director of this.  Virtually everyone in the entire -- in the entire case said that.  This was driven by Mr. Rahbar.

With that said, Mr. Macaulay, he did participate, he did sign on those loans.  He did not recruit employees.  In many ways he had a much lower front-facing, as the government characterized it, relationship with people in the business.

Most of the people in here didn't know Mr. Macaulay.  Most of the people interviewed, the vast majority didn't even interact with him.  Mr. Pierre hired people.  Other trainers and things hired people, but Mr. Macaulay didn't.  He was a tech person.  He was the chief technology officer.  His job was to help construct this gym.  His job was to lay the cable and set up the screens, and do the IT infrastructure and all of that.

He was a 35 percent owner in the company.  He was not a

majority owner in the company. He did have a greater stake than Mr. Pierre. We certainly concede that. But he had a substantially lower stake than Mr. Rahbar, and he also had a much lower level of direction in the company itself, and in this -- and in the course of this fraud scheme.

He takes full responsibility for what he's done, and he's deeply humbled and ashamed by that, but, when compared to the other cases here, this is a man who did not himself personally profit from this at all. He did not buy luxury goods, luxury cars. He didn't do any of those things. And I'm not saying that that makes it okay. It doesn't make it okay, but it does distinguish him from many of the other cases in these PPP loan fraud cases.

This was a real business. It was struggling, as many businesses do. There were questions about finances as COVID hit, but COVID knocked it out.

I was reminded, thinking about -- I used to work in the restaurant business before I went to law school, and I helped open restaurants. And I was thinking about all the work that we did in opening a restaurant before the doors ever opened. It was an enormous amount of work: Building out the facility, getting all the silver, getting all the plates, hiring people, getting, you know, produce, suppliers, all that kind of stuff.

If COVID had hit right then when we were scheduled to open, it would have destroyed -- it would have destroyed the

business, as it did in this situation.

Beyond FIT was a viable business model. It was not able to open because of COVID. They did have viable employees during the course of this. They overstated it. Mr. Macaulay concedes that. He's accepting responsibility for that, but his role in this offense is substantially lower than Mr. Rahbar's, and his sentence should reflect that he is substantially less culpable than Mr. Rahbar.

I concede that Mr. Pierre is in a different situation. He cooperated early on, and he got a benefit for that. Perhaps, Mr. Macaulay should have done the same thing, and perhaps I might have advised him to do the same thing early on in this case had I been representing him at that time, but that's not the situation we're in right now. He's here, he's pled guilty to four counts with no plea agreement, and he's here before Your Honor to fashion an appropriate sentence based on the 3553 factors that we've laid out in our pleading and taking into careful consideration the sentencing disparity arguments that have been laid out and in comparison to the other cases. I trust that Your Honor has carefully considered those, and I suspect that Your Honor has a number in mind already, but I will rest on that and await Your Honor's decision.

THE COURT: Mr. Macaulay, sir, this is your opportunity to address the Court if you want to. I will tell you that I read your letter and the letters that were submitted on your behalf.

I believe your wife wrote a letter.  There were several friends that wrote a letter; your mother, your brother, I think a former coworker, and then all of the -- I think there were two performance evaluations in the material.

MR. GOLDMAN:  There were multiple evaluations but from two businesses.  There were multiple --

THE COURT:  Yes, yes.

MR. GOLDMAN:  Okay.

THE COURT:  And so I've considered all of that, but -- and don't feel obligated, but if you would like to address the Court, you can.

THE DEFENDANT:  Yes, Your Honor.  Thank you for the time to speak to you.  I do want to fully accept responsibility, to show absolute contrition for my actions, to apologize to my family, my mom, my wife, my two young children.  But I know that I will be a better person going forward.  I know that I am an honest person, and I will show that to everyone going forward. Thank you, Your Honor.

THE COURT:  Okay.  And you were in here all morning, so you heard when I said that no one is ever the worst thing that they've done, okay?  The Court recognizes that there is more to you than this, okay?  Your wife and your mother know that as well, and you have those two boys, and they are still going to see you with the same eyes, okay?

The question you will have -- or the question I have for

you is, what are you going to do going forward, okay?  Because you never get to take the easy way out in life, okay?  I don't doubt that it was a very difficult time for you when this business started going south, and we were all in the midst of COVID.  Okay?  I don't doubt that.  But that doesn't make any of this okay, right?  You cannot steal, which is, in essence, what you all were doing by taking what you were not entitled, okay?

And you can't do anything quietly and it not catch up with you at some point, and that's what happened here.  But that doesn't mean that that's all that there is to you, right?  You're going to get beyond this, and you're going to be that example for your children.  And you're also going to show them that sometimes we're always -- when we make certain decisions, there are certain consequences.  That's how you respond in the moment that matters, okay?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  You can be seated.

And so I have considered the presentence report and the position papers of the parties, all the letters that I said were written on your behalf, and the one that you wrote as well, and your -- I believe you are sincere in what you said this morning and what you wrote, okay?

I also must consider the 3553(a) factors, and you heard me this morning talk about how serious this crime was, okay?  You cannot take what you are not entitled to, and it was a lot of

money here, even with the adjusted guidelines.

Even with those, you're talking about over a million, okay?  That is a lot.  And each time you submitted one of those fraudulent applications with that fraudulent information in it, it was a crime, and it was serious, and you were taking that which you were not entitled to and what was intended to help others; not to float your business; not as an investment in your business, but those loans were meant to help people in their need, but not in the type of need for an investment.  It was just wrong.

Now, I know Mr. Rahbar owned more of this company, his name may have appeared more in those 302s, and he took out more -- additional loans that you were not a part of for some other businesses.  That in no way lessens your responsibility here.  I take that into consideration, but that's why I'm saying, your role in here is -- it's more than just somebody who was just going along with the flow, okay?  So you can't shift that responsibility to him.

I consider your history and characteristics.  Those letters describe you as a strong family man and a dedicated husband and father, and one who has lived your life up to this point with great integrity.  That's what those letters describe. I hope that is who you strive to be once you get on the other side of this.

I also take into account the need to promote respect for

the law and to deterrence. I don't think you will go down this road again. I don't think you will put your family in jeopardy again and the future of your children.

I do need to consider the need for deterrence for others, and your attorney has done a good job, and I think has focused the Court on avoiding unwarranted disparities in considering other sentences for similar conduct.

And based on that and your overall history and characteristics, I do find that a variant sentence is warranted in this case; not to the extent that your attorney is requesting, but I do think a variance is warranted.

And based on, as I said, the need to avoid unwarranted disparities, based on your history and characteristics, I do find it. And so, if you would come to the podium, I'm ready to pronounce sentence.

And the one thing that situates you differently than Mr. Rahbar is there is no additional mandatory minimum sentence that is at play here. And you are convicted of more counts, but for sentencing purposes and in calculating these guidelines, they all group into one, okay?

Now, taking all of this into consideration, it is the judgment of the Court that the defendant, Ryan Macaulay, is hereby sentenced to the custody of the Bureau of Prisons for a period of 24 months, and that is to Counts 1, 5, 7, and 11. And that is to be served concurrently.

Upon your release from incarceration, you will be placed on a three-year term of supervised release. And during that time -- Mr. Goldman, did you review the mandatory conditions of release and the standard and the special conditions that are all outlined in the presentence report?

MR. GOLDMAN: Yes, Your Honor, we reviewed those carefully together.

THE COURT: Okay. Mr. Macaulay, is that correct? Did you review those?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. So I'm imposing each of those, all of the mandatory conditions, the standard conditions, and the special conditions. And the reason I'm imposing those special conditions is because this is a financial crime, okay, and there's a need for oversight, and there will also be the need for you to make your restitution payments, okay?

I'm not imposing a fine or the cost of incarceration, because I find you're incapable of paying those. I am imposing the $100 special assessment per count of conviction. I find that this sentence is sufficient but not greater than necessary to achieve the goals of sentencing outlined in the 3553(a).

Did you have any recommendations you would like me to include?

MR. GOLDMAN: We ask Your Honor to recommend placing him at FCI Fairton in New Jersey as the first selection, and an

alternative would be Cumberland, FCI Cumberland.

THE COURT:  In that order?

MR. GOLDMAN:  Yes, Your Honor.

THE COURT:  You said New Jersey?

MR. GOLDMAN:  Fairton, New Jersey.  It's in Southern New Jersey.

THE COURT:  Okay.  And then Cumberland?

MR. GOLDMAN:  Yes.

THE COURT:  Okay.  Now, what about restitution?  Do you all have a restitution order, or do we need to set a date for restitution?

MR. GOLDMAN:  We agreed that -- we have a signed consent forfeiture order here, and we have asked that we could set out 60 days for the restitution order.

THE COURT:  I'll set the same date, November 20th.

MR. GOLDMAN:  November 20th.

THE COURT:  For the hearing on restitution, and I will endorse the forfeiture order and make it a part of the judgment and note that restitution is forthcoming.

MR. GOLDMAN:  I have that signed copy I will pass up.

THE COURT:  Thank you.  Now, Mr. Macaulay, I need to advise you of your right to appeal your sentence and conviction. If you're going to do so, you have to do it within 14 days of today's date.  If you don't do it in writing and in that time period, you will have waived your right to appeal.  Do you

understand?

THE DEFENDANT:  Understood, Your Honor.

THE COURT:  Okay.  Now, what about self-surrender?

MR. GOLDMAN:  We are asking for a similarly lengthy period for self-surrender.

THE COURT:  I understand.

MR. GOLDMAN:  He is caring for his mother who's recovering from heart surgery.  So we did ask until the end of the year, if he would be able to turn himself in.

We're not asking for January, but a time in, you know, end of December, we would ask for.  He's the primary caregiver for her as she's recovering.  His brother is unable to do that because he's -- he has his own health issues and is unable to help.

THE COURT:  Submit me some documentation on that.  For right now, I'm going to do the same 60 days, but that's something that I can take into consideration and extend out, okay?

MR. GOLDMAN:  I appreciate that, Your Honor.  We'll submit something.

THE COURT:  All right you.  Can submit something to me. Did I advise him of his right to appeal?

(Brief pause.)

THE COURT:  I do wish you well, sir.

THE DEFENDANT:  Thank you, Your Honor.

THE COURT:  And you have to -- I know sentencing is a hard

day for people, and it's a hard day for families, okay, but I don't want you to forget that this -- that this is a phase. You're going to have to accept the consequences and deal with those, but, after this, you are going to go on and live that life that you want to live with your family, okay?

And don't lose sight of that, okay?  Don't lose sight of that, Who you want to be after this time, okay?  Is there anything further from the government or the defense?

MS. STARR:  Your Honor, just that we will submit -- we don't need to dismiss any remaining counts of the superseding indictment, but we will submit an order to dismiss the underlying indictment.

THE COURT:  The original indictment.

MS. STARR:  Yes.

THE COURT:  All right.  Thank you for that.  Okay.  Is there anything further from you, Mr. Goldman?

MR. GOLDMAN:  No, Your Honor.

THE COURT:  Then we're adjourned.

(Proceedings adjourned at 12:12 p.m.)

# C E R T I F I C A T E

I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Scott L. Wallace                          12/26/25
----------------------------          ----------------
  **Scott L. Wallace, RDR, CRR**                **Date**
    **Official Court Reporter**