UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | Criminal Action |
| | : | No. 1:24-cr-00180-PTG-1 |
| **RAYMOND RAHBAR, JR.,** | : | |
| | : | Appeal No. 25-4547 |
| | : | |
| | : | September 25, 2025 |
| **Defendant.** | : | 9:18 a.m. |
| | : | |
| ............................. | : | |

**TRANSCRIPT OF SENTENCING PROCEEDINGS**
**BEFORE THE HONORABLE PATRICIA TOLLIVER GILES,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the United States:        **Kristin S. Starr, Assistant United**
                              **States Attorney**
                              DEPARTMENT OF JUSTICE
                              UNITED STATES ATTORNEY'S OFFICE
                              2100 Jamieson Avenue
                              Alexandria, VA 22314
                              703-299-3700
                              Email: Kristin.Starr@usdoj.gov


For the Defendant:            **Joseph Thomas Flood, Esq.**
                              THE LAW OFFICE OF JOSEPH T. FLOOD
                              10621 Jones Street
                              Suite 301-A
                              Fairfax, VA 22030
                              703-691-8410
                              Fax: 703-251-0757
                              Email: Jflood@sfhdefense.com

```
APPEARANCES:   (Cont.)

For the Defendant:              Alyse Wren Ullery, Esq.
                               GIBSON, DUNN & CRUTCHER LLP (DC-NA)
                               1700 M. Street, NW
                               Washington, DC 20036
                               202-955-8500
                               Fax: 202-831-6126
                               Email: Aullery-glod@gibsondunn.com

                               Patrick F. Stokes, Esq.
                               GIBSON, DUNN & CRUTCHER LLP (DC-NA)
                               1700 M. Street, NW
                               Washington, DC 20036
                               202-955-5800
                               Fax: 202-467-0539
                               Email: Pstokes@gibsondunn.com


Court Reporter:                Scott L. Wallace, RDR, RMR, CRR
                               Official Court Reporter
                               United States District Court
                               401 Courthouse Square
                               Alexandria, VA 22314-5798
                               Cell: 443-584-6558
                               Email: Scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
```

**MORNING SESSION, SEPTEMBER 25, 2025**

THE COURT:  Okay.  Thank you.  Please call Mr. Rahbar's case.

THE COURTROOM CLERK:  The Court calls *United States of America versus Raymond Rahbar, Jr.*, Case Number 1:24-cr-180.

May I have appearances, please, first for the government.

MS. STARR:  Good morning, Your Honor.  Kristin Starr on behalf of the United States.

THE COURT:  Good morning.

MR. FLOOD:  Good morning, Your Honor.  Joseph Flood, Alyse Ullery, and Patrick Stokes on behalf of Mr. Rahbar.

THE COURT:  Good morning to all of you, and good morning, Mr. Rahbar.

And so we're on today for sentencing, Mr. Rahbar having pled guilty to conspiracy to commit bank fraud, that was Count 1; and then Count 12 was the aggravated identity theft charge.

Mr. Flood, have you had an opportunity to review the presentence report with your client?

MR. FLOOD:  We have, Your Honor.

THE COURT:  Okay.  And, Mr. Rahbar, sir, please stand.

THE DEFENDANT:  (Complies.)

THE COURT:  Have you had an adequate opportunity to review the presentence report with your attorneys?

THE DEFENDANT:  Yes, I have, Your Honor.

THE COURT:  And is there any reason that I shouldn't

proceed with sentencing today?

THE DEFENDANT:  No, there's not, Your Honor.

THE COURT:  Thank you.

THE DEFENDANT:  Thank you.

THE COURT:  Ms. Starr, have -- did the proper victim notifications go out in this case?

MS. STARR:  Yes, Your Honor, I believe they have.

THE COURT:  All right.  And so -- and I know we have several objections to get through, but first let's start with what we have.

The presentence report started with a -- for the conspiracy to commit bank fraud count, with a base offense level of 7, an 18 point increase based on the amount of loss being more than 3.5 million but less than 9.5 million; a two-level increase for the -- involving more than ten victims; a two-level increase because the offense involved misrepresentation or other fraudulent action during the course of a bankruptcy proceeding; a two-level increase based on the defendant deriving more than 1 million in gross receipts from one or more financial institutions as a result of the offense; a two-level increase for a role in the offense.  The first adjustment in role was based on it being an abuse of a position of trust.  The second role adjustment was for being an organizer, leader, manager, or supervisor.  This all resulted in an adjusted offense level of 35 with a two-level decrease for acceptance, and so the total

offense level was 33.

Criminal history category is 1 because there's zero criminal history points that yielded an advisory guideline range of 135 to 168.

For Count 12, it is a mandatory 24 months consecutive to any other count.  Supervised release range here is two to five years for Count 1, one year for Count 12.

The fine range is 35,000 to 6 million 505 and 24, and there's a $200 special assessment.

And so with that, government, did you have any objections to the presentence report?

MS. STARR:  No, Your Honor, we do not.

THE COURT:  Okay.  And, Mr. Flood, let's walk through yours.

MR. FLOOD:  Ms. Ullery is going to be addressing the guideline objections today, Your Honor.

THE COURT:  Good morning.  Come on.

MS. ULLERY:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. ULLERY:  Unless Your Honor has a particular place you'd like me to start, I can just quickly go through these.

THE COURT:  Yes.

MS. ULLERY:  Starting with loss amount, just to crystallize the disagreement here, the scope of our objection is whether it is a plus 16 or a plus 18 enhancement.  We have

already stipulated to a loss of a minimum of 3.1 million.

The government has said that 100 percent of these loan proceeds should count towards the loss amount because any false statement in the loan application itself renders the entire thing fraudulent, and that is just factually and legally incorrect. The employee --

THE COURT:  Why?

MS. ULLERY:  The employee and payroll representations were inflated.  They were not invented wholesale.  And the cases that we've cited in our brief, *Wilson* and *Coghill*, make it clear that the lost amount has to be tied to the fraudulent conduct, the false statement itself.  Not all of the statement was false. Mr. Rahbar's entities would have been entitled to a certain amount of money if they had submitted it with the existing accurate information.  It is just those additional inflated employees and payroll expenses that are the fraud.

THE COURT:  I don't know if I agree that your cases were -- really spoke to this particular situation.

MS. ULLERY:  So, the *Wilson* case is a little bit old, but I think that it's still -- it's still on point because it stands for the proposition that you have to tie the loss to the conduct. And I understand in the *Wilson* case there was a lie in between loans and that was the framing.

The *Coghill* case -- the *Coghill* case applying *Wilson* reached the opposite conclusion that we're asking here, but it

applied it correctly because *Coghill* was asking for the Court to find that -- for example, the amounts that were attributable to just accounting errors were not part of the loss amount and needed to be excluded.  And if the government's position were correct, the Court would have said, "No, we don't have to consider that at all," but the Court didn't.  They cited *Wilson* and they said, "Yes, it does have to be tried -- tied to the actual fraudulent conduct," but the District Court properly determined that what you're saying is not correct, and that that should be included here.

So when you see it applied with the statement, the principle rings true even if the circumstances are not directly in alignment here.

And part of the issue, Your Honor, is that this is pretty unique, and PPP loan fraud cases typically involve people inventing businesses wholesale.  There's not a lot of case law involving something like this where there's a fully legitimate functioning business that is weeks from opening, a massive gym, and --

THE COURT:  Um-hmm.

MS. ULLERY:  -- it shut down.

THE COURT:  But the government's argument is, even if they accepted your position, the only apportion of this would come off of the loan amount, which is -- or the loss amount, which is only the salary that would have been attributable based on what he

paid out in 2019.

MS. ULLERY:  Yes, Your Honor.  The math there is overly simplistic.  The government cites one entity's numbers for the loss amount here, which involves six different entities that received loan amounts, so they're only doing that analysis for one entity when there's six.  All of those other entities were in different phases of operation and could have qualified for different amounts of funds here based on expenses and employees or some combination thereof.

THE COURT:  But I thought the amount -- when I looked at the citations that you all had, the amount that an -- even though the loan may be spent on a number of different things, the amount of money that you are entitled to is based on payroll costs.  So even if you have all of these things, it is:  This is the number of employees; this is what we -- these are those payroll costs for it, but that's it.

So with these six other entities, are there other -- how many employees are we talking about?

MS. ULLERY:  There's different calculations that can happen here.  There's employees.  There's also payroll, which can account for independent contractors in a way that the employee count cannot.  So it is different depending on the entity and the point in time that we're talking about, but, for example, the AMC business was a fully functioning business that his father left to him when he died in 2019.  It had been functioning for many, many

years, so it's -- it's not like we're talking about --

THE COURT:  So that company had employees?

MS. ULLERY:  It had -- well, at minimum two.  There are other individuals who have been employed at different points in time to that entity depending on the projects that they were working on.

THE COURT:  All right.  Go on to the next one.

MS. ULLERY:  I just want to quickly note the application 3D argument that the government raises.  That note -- I'm not sure how it's relevant here.  It's just a list of things that can be credited towards the lost amount.  It's not exhaustive.  It does not purport to be exhaustive, and the government has not cited any authority to establish that it is.

And the government also makes a point that how the money was spent doesn't matter.  Of course it matters.  It further gives context to the facts that he received an amount of money for these operating businesses, and then he spent it on, in part, and in significant part, legitimate business expenses, paying people, paying business operations, paying utilities.  Of the 3.25 million actual loss amount, Your Honor, the government's forfeiture calculation, if we just accept it as true, say that he received only $251,000 of that personally.  So what happened to the other money?  The government's own discovery makes it clear that it was used at least in part on these business expenses.

THE COURT:  That's not a winning argument to me.  I

understand why you're making it, but we have someone who fabricated the number of employees that he had working for him, fabricated information on his loan applications, created some documents wholesale in support, and got money that he was not entitled to, period.

MS. ULLERY:  That's true, Your Honor.

THE COURT:  Period.

MS. ULLERY:  That is absolutely true.

THE COURT:  And so, which is really to me it's just -- it's only about, is it worth the 2 point -- or the two-level argument, which from either side to me is neither here nor there, but I don't care that -- because both have said this at some point in position papers that money was then put back into the business.  It wasn't the government's -- you know, this wasn't for them to invest in this company, right?

MS. ULLERY:  Yes, Your Honor.  And that is why he's here pleading guilty today.  I think our point is just that it's the government's burden to get us above 3.5, and they haven't accounted for legitimate employees and expenses, that they haven't even admitted were there, in a way that justifies the plus 18 as opposed to the plus 16 enhancement.

THE COURT:  Understood.

MS. ULLERY:  Moving on to the bankruptcy objection.  The justification for this enhancement is that Mr. Rahbar lied during a bankruptcy proceeding in 2023.  The transcript -- and he was

asked to confirm whether he paid a certain amount in payroll for one of the BYNDfit entities, and he responded, "I believe so, yes."  That is not sufficient to qualify for this enhancement.  It's not at all clear that this was an intentionally false statement.  It was heavily qualified, and he did not have any documents in front of him.  It was purely from memory.

THE COURT:  Um-hmm.  Wasn't a basis also that the Bankruptcy Court dismissed the case because they said it was filed in bad faith?

MS. ULLERY:  That was -- well, I'm not entirely sure about the government's point with that, but they dismissed it for being in bad faith for reasons completely unrelated to this.  The reason they dismissed it is because they found that this was actually really just a dispute between Mr. Rahbar and one particular creditor, which was the landlord for BF Chinatown.  This is a ongoing and heated civil litigation matter, and it relates to the fact that this was supposed to open in 2019 to begin with, and there were issues with the landlord that pushed it into 2020.  That is why it was dismissed in bad faith, nothing to do with the PPP loan statements.  It's just cherry-picked out of a transcript that's about a bunch of other things.

And in addition to that, the government has also failed to demonstrate that this is relevant conduct or part of the same course of conduct or common scheme to justify accounting for it here.  This is three years later.  There's no common factor,

other than it happens to be about BYNDfit.  And there's no evidence that he was using the proceedings to try to evade detection.  It's just -- it's not related at all.

Moving to the abuse of position of trust.  For this enhancement to apply, the defendant needs to be both in a position of trust or -- private or public trust from the victim's perspective, and abuse that trust by exceeding or abusing the position to obtain or use the inside identification.

The government offers no evidence that Mr. Rahbar was in a position of trust from the victim's perspective here.  Being a CEO by itself does not qualify him as having a position of trust.  And the government has offered no case law to support that proposition either.

The cases we cited, like *Caplinger* and *Everso* make it clear that in fraud cases this is of particular concern because fraud inherently involves some sort of abuse of trust at base level.  That's why a position of trust here requires something more like a fiduciary duty and not just being a CEO.  There's no evidence of a relationship at all between the victim and Mr. Rahbar, but a lone relationship of trust.  All of her intersections were through the government's cooperator, Mr. Pierre.  She provided her resume to Mr. Pierre at a job fair for the purpose of potential internship or employment at BYNDfit and interacted exclusively through him.

THE COURT:  This looks very close to me to the example

that's included in the application, though, where someone is working, I think, at a hospital but they're not the person that necessarily interacted with that patient, but by virtue of their employment there they have access to certain information and then they use that.

And here you have the CEO of this company, and you have this -- you know, these students showing up for, you know, a job fair, and they're providing information about themselves in the hopes of gaining employment.

I think there is some kind of level of trust there, and you are trusting that the people that you are providing your information to are not going to then use it inappropriately.

MS. ULLERY:  That may be the case, Your Honor, but I don't believe that that rises to the level of something like a fiduciary duty that's required here.  Mere confidence is not enough.  The cases say that explicitly.  It has to be something more.

And importantly, the cases that are in the application notes are informative because, for example, the one that you just mentioned, they're trusting your medical information, right? There are protection laws around this.  It is a hyper-protected type of information that you're giving over to them.  These are resumes.  This is not like some special category of information that has extra legal protections or that you would have a heightened expectation of privacy in.

And, in addition to that, they have to first establish a position of trust, but then also that he abused or exceeded his authority in using the means of identification.  Mr. Rahbar didn't have special access to this information just because he was CEO.  This is a start-up.  They didn't have like a payroll department.  It's three cofounders starting this and trying to get people onboard.  He had to ask Mr. Pierre for the information.  He did not -- he himself did not have access to it, and so we don't think this qualifies.

Acceptance of responsibility, Your Honor.  It is completely arbitrary for the government to withhold this third point --

THE COURT:  Don't even make a third-point argument.  Okay?  Mr. Rahbar pled guilty 12 days before the trial.  Okay?

MS. ULLERY:  You're going from the day of the actual plea entry, I'm assuming?

THE COURT:  Um-hmm.

MS. ULLERY:  Okay.

THE COURT:  It's very close, and -- Mr. Stokes knows -- that that point is not -- is not a given.  It has to be something that is bargained for, but, more importantly, it is earned.

MS. ULLERY:  Absolutely, Your Honor.

THE COURT:  And it is earned by timely notifying them of your intention of pleading guilty to stop the work in the case, and that did not happen here.

MS. ULLERY:  Understood, Your Honor, and that's absolutely correct in terms of the purpose and the government's discretion. That was not the reason that we were given.  The reason we were given is this generic policy that they have recently enacted saying they will not give this point to anyone -- not just Mr. Rahbar -- who doesn't plead before the motions hearing.  And our argument is that is arbitrary and is not tied to trial resources specifically.  The government has not made the argument that our plea timing prevented them from --

THE COURT:  I'm not persuaded by that either.  I'm not persuaded by that.

MS. ULLERY:  Okay.  Understood, Your Honor.  I would just also note that at the time that we were approaching the government for a guilty plea, we were still in the middle of discovery.  The government had not given us all of their document productions at that time, so the timing was -- they're holding us accountable for a timing that is part of their own creation here. We would still submit that that is unfair.  Mr. Rahbar is accepting responsibility, and he's here to do that today.

THE COURT:  He's gotten his two points.

MS. ULLERY:  Yes, he has.

THE COURT:  Anything else on this?

MS. ULLERY:  That's it, Your Honor.

THE COURT:  Ms. Starr.

MS. STARR:  Thank you, Your Honor.  I intend to spend most

of my time addressing the loss amount argument, but I will certainly touch on the other ones and answer any of Your Honor's questions.

In terms of the loss amount, you know, there's some cases that Mr. Rahbar's counsel has cited, but this is a sim- -- this is a pretty well trotted principle.  In a recent decision by the Fourth Circuit, which affirmed a District Court decision in the case of *United States v. Freitekh*, there were two individuals, a father and a son, who obtained several PPP loans.  The District Court there used the intended loss amount for the loss calculations, which was the full amount of PPP loan money for which the applications were submitted.  And there the Fourth Circuit affirmed that you do this as the guidelines say.  You generally -- unless there's some extenuating circumstance -- use the greater of actual versus intended loss.  And the only way to reduce the amount in a PPP context is if the defendant returned the PPP loan money before the detection of the fraud, which is in -- which comports with comment 3EI of the guidelines, and this is a principle --

THE COURT:  Hold on.

MS. STARR:  Go ahead.

THE COURT:  And I will also say this.  If you're going to come to court with cases, make sure you've given them to the other side, you file something on the record, and I have an opportunity to review it ahead of time --

MS. STARR:  Understood, Your Honor.

THE COURT:  -- otherwise it really is not helpful.

MS. STARR:  Understood, Your Honor.  Um, and --

THE COURT:  I'm not done.

MS. STARR:  Oh, I'm sorry.

THE COURT:  The other thing is, I think what the flux of their argument, I don't know how much Mr. Rahbar's team focused on actual versus intended.  It really came down to whether or not there was an "You should consider what he should have gotten."

MS. STARR:  Um-hmm.

THE COURT:  And in your position paper, you don't seem to -- you push back on it somewhat, but you even say, like, well, even if he was entitled to an offset of this amount, it would not change where he fits within the -- within that range.  It wouldn't take him down to a -- a -- to the next category.

How did you get there?

MS. STARR:  Sure, Your Honor.  Again, we don't believe you ever get there, and it hasn't been done in cases -- PPP cases in this district that I'm aware of.  That --

THE COURT:  In the case that you're citing to with the PPP, is it a case where the person had no business at all --

MS. STARR:  It's --

THE COURT:  -- or was it a case where there was a legitimate business, but they didn't necessarily -- all of the representations were not -- you know, they fudged the numbers?

MS. STARR:  I believe it was the latter, Your Honor, similar to the case that we have here.

THE COURT:  What is the name of that case?

MS. STARR:  I have the citation for you.  It's 114 F.4th 292, United States vs. Freitekh, F-R-E-I-T-E-K-H.

THE COURT:  Oh, say that again, because I stopped writing at 114.

MS. STARR:  114 F.4th 292.

THE COURT:  292.

MS. STARR:  And I apologize for not bringing copies of that case, Your Honor.

THE COURT:  All right.

MS. STARR:  That said, Your Honor, there -- you know, one of the examples even that the defense cites is Tarik Jaafar. That was an individual who, with his wife, submitted applications for about $6.6 million worth of PPP loans.  The majority of those funds were frozen or returned, so they only ever received about $30,000.  You know, that's not the situation here.  There the court did proceed with the $30,000 amount.

Another similar case that the defense cites, that was a case I actually helped prosecute, was *United States vs. Ben Magee*.  That was another one that was actually quite similar in some ways to Mr. Rahbar, where there were some number of employees that did work for these businesses at some time.

I think the difficulty here, and it's touched on in the

declaration that's appended to our position paper --

THE COURT:  Okay.  The case you just mentioned, what happened in that one?

MS. STARR:  Mr. Magee?

THE COURT:  Um-hmm.

MS. STARR:  In Mr. Magee's case -- and I know the defense discusses it.  Mr. Magee, along with his business partner, Michael Gilcher, applied for something like -- I think Mr. Magee applied for something like 17 -- 28 different PPP loans across 17 different entities, and Mr. Gilcher helped with those and he also applied for a series of PPP loans in his own name for businesses he created, with the help of Mr. Magee.  They did it in tandem for all of them.  And in those cases, Your Honor, it was quite similar, where they had these entities.  They were either hopeful something would happen with them or they had had the entities around and nothing had happened with them.  They had at different times -- they also operated a gym out of Manassas, Virginia.

THE COURT:  This is one of the cases that they cited regarding disparities?

MS. STARR:  Correct.

THE COURT:  Okay.

MS. STARR:  Correct.

THE COURT:  All right.

MS. STARR:  But I think it's also indicative here where, again, they used the entire loss amount, and it's because,

despite the fact that, you know, there were some number of employees that did work for this gym at some point, there were no payroll taxes paid for the vast majority of the time that these businesses were in operation.

I also note that they continue to harp on the fact that independent contractors can be counted. That's absolutely fully against SBA's guidance in terms of how the PPP operated. Independent contractors were explicitly excluded from appropriate employee counts, and that was due to the fact that independent contractors could have various different companies that they work for. So independent contractors were allowed to apply for a PPP loan in their own capacity but were not able to be counted.

So if all BYNDfit had at the -- for the relevant timeframe at the time of filing for the PPP loan, then those employees can't count. And so what we put into our position paper is, that to the extent they want to argue that there were employees, we have to look to the payroll taxes because that's the only thing we have that we would -- the government would argue has any imprimatur of veracity to it.

And so looking at those payroll taxes for the fourth quarter of 2019 for BF Management gives you the payroll that they claim to have had for that quarter, which is approximately 145,000.

THE COURT: Well, their response to that was that that wasn't the only company. There were these other companies that

also had employees, so --

MS. STARR:  Right.

THE COURT:  -- that those would be counted.

MS. STARR:  And we can't find any payroll taxes for those entities during that -- the relevant period and/or can't verify, based on other information in the case, that they weren't double dipping the employees or, you know, that -- who was actually working for what.  And so that is why we point to that.  So, even if you did deduct that amount -- which certainly we would say you shouldn't get there.  It's not in line with the cases that have come before and what this District's practice has been, it certainly wouldn't move the needle below the 3.5.

And I think to the government, the issue here is really it's not that they can't bring before Your Honor the fact that there were some legitimate employees.  The government is certainly not saying this was some charade where there was no gym.  You know, the government very much recognizes that Mr. Rahbar and Mr. Macaulay and Mr. Pierre all believed very much in this business venture and did hope to have it open, that they had a couple of trial classes.  That is certainly something the government concedes, but whether or not they had legitimate expenses should go to the 3553(a) factors.  It is not properly used to reduce the loss amount in terms of a sentencing enhancement.

So, yes, Your Honor should certainly consider that in

terms of the nature and circumstances of the offense, that this isn't somebody either who went out and spent the money on Lamborghinis or a boat, but that this can be brought in as a real business expense.

And, again, as Your Honor points out, the intent of this program is in the name.  It's for payroll.  Whether or not they had legitimate business expenditures -- and we could have a whole sideshow up here as to whether or not the rent for the mansion that Mr. Rahbar lived in could actually be considered a proper business expense -- you know, that -- we don't need to reach that.  All they needed to do was put forward their payroll.  And at best, the government contracted that they had seven employees across the relevant entities, and in one application alone Mr. Rahbar lists 57.  So, it's -- you know, in the inducement of this loan there's fraud right out of the gate.  And as Your Honor is well familiar, there's several times that the defendants had to certify on the face of those applications that everything -- under the penalty of perjury and other criminal violations -- were correct and true, and they didn't do that.  And so we don't believe that there's any reason to apply any offset for legitimate expenses to the loss amount.

THE COURT:  Okay.  Go on to your next.

MS. STARR:  Yes.  And, Your Honor, in terms of whether or not the defendant has abused a position of trust, the government saw the example you gave that is in the commentary and

application notes to guideline 3B1.3.

And I think the other example that is also indicative and helpful here is a volunteer at a charitable organization who exceeds or abuses the authority of his or her position by obtaining or misusing identification information from a donor file.  A donor certainly doesn't hand that necessarily to a volunteer, but the volunteer has access to that information by virtue of their role at a charitable organization.

Mr. Pierre's testimony is that Mr. Rahbar told him to go get this information from people, and so Mr. Rahbar vastly misused the fact that he had this, you know, base of information from college students who thought they were potentially -- I mean, they were at a career fair.  They thought they might be able to get an internship at the company or maybe be a fitness instructor.  And there is certainly PII in things like resumes which absolutely is protected.  I understand, you know, it's not HIPAA, but there's certainly protections around PII, and I don't think any of these individuals, as supported by the three 302s that we appended to our position paper, believed in any sense that they were consenting to anyone at the company, a company led by Mr. Rahbar, a PPP process led by Mr. Rahbar, to have their information used in support of a loan application, especially when it was listing salaries for like $100,000, which none of these individuals ever received.

So, I think there's absolutely a sufficient -- based on

the application notes -- commentary to this guideline to add the additional two points for that enhancement.

In terms of -- I don't believe we are still arguing about the ten or more victims; is that correct?

MR. FLOOD:  We've withdrawn that objection.

MS. STARR:  Okay.  And so the only other one that we need to turn to is the bankruptcy proceeding.  Your Honor is absolutely right that many -- many of the reasons that this enhancement was applied were because there was sufficient evidence, probably, to bring, you know, a false statement in a bankruptcy proceeding.  This individual used -- serially used the bankruptcy process to continually file bankruptcy petitions to get out of the debt that the business had accumulated.  And part of that had to account for the PPP loans, as that was -- for most of the business' or half of the business' operation, that was the influx of cash that was -- that they were attempting to get.

And so in so doing, they were asked about these in-flows of money that were coming in, and the -- Mr. Rahbar had to go in and say -- and support what he put on those PPP applications.

But, as Your Honor pointed out, I mean, as I understand in EDVA, I believe Mr. Rahbar was barred from re-filing any bankruptcies due to bad faith.

THE COURT:  Their response to that was that it was bad faith not based on any -- not necessarily based on our factual basis that is before me right now in terms of the, you know,

false statements and these loan applications, but it's based on the fact that there was a dispute between him and I guess one of these creditors about the legitimacy of what was owed.

MS. STARR:  Yeah.  And, Your Honor, that may well be true. I think it is hard for the government, who is not -- we are not a party to that bankruptcy, to understand exactly the contours of why that decision was made, but, you know, we do know and do have evidence in this case that one of the bankruptcies I believe Mr. Rahbar had Mr. Macaulay file to try to force the business into involuntary bankruptcy.  So this was, to the government's perspective, certainly part of this scheme to defraud.

THE COURT:  And it may very well have been, but I don't know if I have a sufficient factual basis in front of me --

MS. STARR:  Understood.

THE COURT:  -- to support this application here.

MS. STARR:  Understood, Your Honor.  And I think, you know, while we did put that one example in there, it would be -- there are plenty of examples in there.  I think the difficulty in finding one was often, as you imagine, the best we have to go through this in terms of what false statements were made, were deposition transcripts, right, from that creditor meeting.  And it is very difficult at times to go through and lay out succinctly examples.  So we found -- we picked one that we believed was a very short and succinct example of the misrepresentations made in that bankruptcy, but we certainly

understand that the factual record doesn't necessarily flesh out the bad faith point.

I believe that is all I have on those points.

THE COURT:  Do you have anything further?

MS. ULLERY:  Yes, Your Honor.  Thank you, Your Honor. Just a couple of quick points to address what the government said.

The cases that we've cited, that the government mentions in relation to the loss amount argument, it is not at all clear that the loss amount be -- well, first of all, was at issue at all.  In fact, for the *Magee* case, we know that the loss amount was already agreed to in advance.  It was not part of what they were arguing over to begin with, so it is -- it is not appropriate to try to transcribe those facts here because they had already severed in advance and agreed that they didn't need to fight about that.

The government says that the taxes -- or the payroll taxes are the only thing that they have to go off of.  That's not true, Your Honor.  They interviewed multiple witnesses who said explicitly that they were performing work for not just BYNDfit, but they also interviewed people with relation to the AMC business as well.  This was a start-up.  They did not have a fully functioning, you know, third-party payroll processor ready to go in 2019.  They were still in the process of building that out.  Those records were incomplete, and the government knows

that, and the government talked to people who said that they were doing work during that period even though they may not have been reflected during that in the payroll taxes.

I just -- I think an example is illustrative. If what the government is saying is true, then if there was a loan application that had 100 legitimate employees, and two of them were inflated and illegitimate, the entire loan would still count towards the loss amount for that individual. And that's just an absurd result. I understand it may not be easy or clean for the government to do that, but that is their burden and they have not met it.

And the last point on that, Your Honor, independent contractors, we have not said that they can be counted for purposes of employee count. The statute is clear, they can be counted for payroll expenses, and that's 15 U.S.C. 636A36A8 --

THE COURT: I have it.

MS. ULLERY: -- so that's just untrue.

I also wanted to just quickly touch on the abuse of position of trust points. The government's insinuating that Mr. Rahbar told Mr. Pierre to go get this information. This happened before COVID. This is not like Mr. Rahbar --

THE COURT: I don't think that's what she was saying. I think what she said is he requested the information from Mr. Pierre.

MS. ULLERY: That's true. That's absolutely true. But,

if anything, it indicates he did not have special access to this information based on the fact that he was CEO.  He did not exceed his authority in getting that, and that's the standard here.

And that's all I have.

THE COURT:  Okay.  Thank you.

So, with respect to enhancements, it is the government that bears the burden of showing whether or not they are appropriate, and here, when it comes to this loss amount, we're basically just talking about a -- two levels here, a 16 versus an 18.

And, Ms. Starr, you may be right with some of the cases. The problem is I didn't have them ahead of time in order for you to meet your burden, and so I'm going to sustain their objection with respect to the application of the 2B1.1(b)(1)(j), and I'm going to find that it is 2B1.1(b)(1)(i) that applies.  And that's the one that is more than 1.5 but less than 3.5.  And I'm using the loss amount that's been acknowledged in the Statement of Facts, which is the 3.1 million.

With respect to the abuse of trust enhancement, it wasn't focused much on any arguments today, but in your papers you seem to focus a lot on the fact that the victims in this case were the banks, and there was a fiduciary relationship between the banks and Mr. Rahbar.  And today -- and I think it's based on their position paper, too -- made it clear that they're talking about these victims, these college students that showed up at job fairs

and provided information.  And I disagree with -- I understand your arguments, but I just -- I just disagree with them.

I do think that there's a certain level of trust when you show up somewhere and you are providing your information to someone, that, but for them being at this job fair soliciting this type of information, they would not have access to it.  And Mr. Rahbar, by virtue of him being CEO of the company, taking that information or requesting that information from Mr. Pierre and then using them in these loan applications, I think that is a abuse of trust there.  And I think that it is akin to the example of a volunteer at a charitable organization, when people are providing information because they have the expectation that it's going to be used in a certain way.  It's not the context of the orderly in the hospital where you have medical records and that sensitivity.  It's something different.

But I do think that that applies here, and I think it's by virtue of his position that he had access to this information, which contains interns' personal information and that he misused it.  So I'm overruling your objection with respect to that enhancement.

And I think I've already indicated I'm sustaining your objection regarding the bankruptcy proceedings because I just don't think in the record before me that I have here that it's clear that it is applicable.

And so now with those changes, let's see.  So, paragraph

55 would then be removed from the PSR.  That's the one that applies the enhancement for the misrepresentation and bankruptcy proceedings.

And then the other change would be in paragraph 53.  I already said that it would be "I" that applies, and so that means it's a 16-level increase.

So, if my math is right -- and please check me -- then that's going to, in paragraph 61, be adjusted.  Offense level is going to be a 31.  And then that would change the calculations in 63 -- paragraph 63, paragraph 64, and paragraph 66.  The 35 would be 31.

With the two-level decrease for acceptance of responsibility, then the total offense level should be a 29, and that is going to change our computations in paragraph 99.

Let's see here.  I think the new guideline range is going to be 87 to 108 months.  Criminal history category remains the same.  Let me see.  I think this is going to change our fine range.  I think that's going to go -- the bottom number is going to be 30,000 instead of 35.  Let's see here.  Yes.

Okay.  I don't know if it changes the top number.  I don't think it does.  Does it?

THE PROBATION OFFICER:  It does not.

THE COURT:  Okay.  Thank you.  Thank you.  All right.

Okay.  So, with these changes, I adopt the balance of the presentence report and those are our new numbers.  The range is

87 to 108, for the advisory guideline range, and the bottom number on the fine changes.  Everything else, I believe, remains the same.

We'll proceed to final argument as to sentencing, first from the government.

MS. STARR:  Thank you, Your Honor.  I do believe Your Honor is well aware of the facts of this case at this point, but I do think it's worth restating in some succinct fashion.

Mr. Rahbar, Mr. Macaulay, and Mr. Pierre, it is uncontested, cofounded a start-up gym named BYNDfit.  When that business began to fail -- and it was already failing prior to the pandemic due to construction and delays and issues with rent -- Mr. Rahbar and Mr. Macaulay conspired to defraud the PPP program and launder the fraudulent proceeds.

This is an important note.  The defendant would have you believe that this was all a COVID pandemic issue, but the gym completion had already been pushed out at least once, and the defendant and his business partners were already struggling to pay their rent, construction companies, and equipment providers prior to the pandemic ever occurring.

Mr. Rahbar and Mr. Macaulay both fraudulently obtained and fraudulently spent their PP loans.  To fraudulently obtain the loans, Mr. Rahbar and Mr. Macaulay applied for PPP loans in the name of a series of shell companies:  BF Chinatown, BF Management, and the hopes and dreams of a BF Georgetown.

According to state employment records and IRS records, these companies had virtually no employees. Despite that, Mr. Rahbar and Mr. Macaulay represented these companies had dozens of employees, in one instance up to 54 on one application.

And maybe adding insult to injury, most of the people listed as employees on the applications were friends and families -- and friends and family members of the defendants. And one of the more egregious facts is that many of those listed were college students who gave their personal information to BYNDfit at a career fair in hopes of applying for an internship or potentially a fitness job.

The defendant even had obtained information through Mr. Pierre that had been to confirm the information for these college students for the PPP loans and continued to make sure that these individuals knew there was possible employment with the company.

Either way, virtually none of these people actually worked for BYNDfit. None of them received salaries of $100,000, and none of them gave Mr. Rahbar or Mr. Macaulay permission to use their information to apply for PPP loans.

On the back end to fraudulently spend the money, Mr. Rahbar and Mr. Macaulay signed up numerous people -- some of whom were listed on PPP applications, some of whom are not -- as employees using a payroll processor, Gusto. They used Gusto to send varies amounts of PPP money to their friends and family. By

doing so Mr. Rahbar and Mr. Macaulay created the appearance of legitimate payroll expenses, but then Mr. Rahbar had Mr. Macaulay ask people and he asked people himself to send most of that money, if not all of it, back to BYNDfit so that they could spend the money on unauthorized expenses like rent for the defendant's house.

As BYNDfit was failing, Mr. Rahbar and Mr. Macaulay faced increased -- increasing pressure to pay their business partners, so Mr. Rahbar caused BYNDfit and its associate entities to file for bankruptcy.  And I'll leave that there.

Your Honor, this wasn't just a momentary lapse.  As is often the case, and is certainly the case here, the sentencing position paper for the defendant makes him out to be an entirely different individual than the one who would come before this Court for a criminal sentencing.

But this wasn't just fraudulently loan applications, it was extensive tax fraud across multiple entities.  And the government and this Court is presented sort of with a Jekyll and Hyde situation.  As was replete in the discovery through witness interviews, the witnesses here described Mr. Rahbar as a bully, as abrasive, as brash, as a serial litigator who was happy to file a lawsuit if he didn't like how something went, and as a know-it-all.  He used his law degree and his legal training and his position as CEO to make those around him believe he knew exactly what he was doing and all of it was on the up and up.

Your Honor, it's also worth pointing out that as a result -- since the defendant has pleaded guilty, there's a series of approximately seven civil suits that are still ongoing based on Mr. Rahbar's view of how this fraud scheme played out.

And I want to touch on 8533 Georgetown space.  Both Mr. Macaulay and Mr. Rahbar discussed this.  This was the mansion that Mr. Rahbar lived in, a house worth approximately $4 million. They speak about how they had to move to that space in the pandemic due to the fact that they couldn't be in person at the gym.  In fact, they could have been in person at the gym, and there were witnesses who said they did used to work out of that space.  The reason they weren't allowed to be in that space anymore is because they weren't paying the rent.

And I would want to point out one of the things about the letters of support that the Court has received from many of Mr. Rahbar's friends and family.  It's worth pointing out that many of these individuals who wrote letters were recipients of illicitly obtained PPP funds, including Ms. Kitter [ph], Mr. Makobar [ph], and several of his family members, and Mr. Raisor [ph].

What this case also shows is the immense hubris and arrogance of the defendant.  He abused the fact that others trusted him, reminded them of his business acumen and legal training, and it was way to ensure that no one questioned his decisions.

In fact, several -- one individual in particular contacted Mr. Rahbar after the fact to ask about why he had put her down for all this because she now was having a massive tax liability due to the fraudulent statements made in these PPP loans and the forms that he tried to -- the W-2 forms that he tried to revise from what the payroll processor had sent.  And he was unsympathetic towards the fact that she had an extended tax liability due to him trying to obtain more PPP fraud funds than he was entitled to.

Your Honor, of vital importance, especially in fraud cases, is to deter fraud in government programs, especially one that was geared towards helping business owners in an unprecedented time of dire need.

In fact, crimes like this, where money was carefully laundered to make it appear legitimate and then only, you know, given back to the defendant through Venmo payments, are in some ways more pernicious, as they are more difficult to root out and more carefully calculated for personal enrichment, even if they don't result in luxury purchases.

Every dollar that went to an undeserving business such as BYNDfit, where every extra dollar that went to a business that fraudulently claimed excess payroll, prevented thousands of eligible small businesses from receiving any funds at all.  This program didn't have unlimited funds, and the used end cases have been replete with businesses who were not able to receive funds

at all.

Your Honor, the defense does go through several comparable cases, and the government does recognize that many comparable cases see the individual here, Mr. Rahbar, as in a similar role to those who received approximately 60 to 80 months. Those individuals are people like Mr. Magee, Mr. Ruden, Mr. Rosenberg.

The defendant here, though, was unmatched in his sophistication and all-encompassing PPP fraud. The government has said multiple times that it believes he used his law degree and his position to wield a tremendous amount of influence over his peers and colleagues.

Not only did he drive the PPP process and devise a manner in which the company would inflate the number of employees by using a list of college students and friends at their disposal, but then he ensured his tax statements also matched the section, fully inventing new tax forms to make sure everything was papered up sufficiently.

As a result, Your Honor, given the revised guidelines, the government does believe that a guideline sentence is sufficient but not greater than necessary to accomplish the Section 3355(a) (phonetic) sentencing objectives.

THE COURT: You briefly addressed these other cases that they brought up in terms of arguing the need to avoid unwarranted disparities.

MS. STARR: Um-hmm.

THE COURT:  Is your only distinction between those cases and Mr. Rahbar's case the fact is the level of sophistication?

MS. STARR:  No, Your Honor.  I think the problem with -- I think the government has to recognize the fact that there does seem to be a pretty universal sentence for individuals who play a role as sort of a leader of the PPP fraud scheme.  I think that's uncontroverted.  It'd be silly to stand up here and say otherwise.  I, in fact, worked on one of those cases, so it would be hard to say otherwise.

And I think the problem with generalizing across all of them is, from my review of those cases, they're just incredibly fact-specific.  And in each one sometimes you have someone with a law degree, someone with more power, more -- a higher loan amount, less loan amount, somebody who used it for luxury goods, someone who had some legitimate business purpose.  It's very hard to generalize across it.  I think it's a very fact-specific thing, so the best that the government can do in this instance is point out what we believe to be the aggravating factors here.  But we do recognize that there does seem to be, particularly in EDVA, a sort of common sentence that does get handed down in cases that do seem very similar to his.

THE COURT:  Now, I looked and pulled the numbers off of JSIN, in terms of based on what the median -- both the median length as well as the average, and it was around 60, 61 months.  So it's not just EDVA, and I'm looking at for this particular

offense level --

MS. STARR:  Sure.

THE COURT:  -- and then across.

MS. STARR:  Right.

THE COURT:  Okay?

MS. STARR:  And I -- given that I do think that this Court likes to have most of its own cases in front of it, I did not extrapolate further, but I very much appreciate that point that it does seem to be more of a national standard.

THE COURT:  Okay.  And I do look at, you know, EDVA cases because these are people that I know.  That doesn't mean I necessarily agree with them, because sometimes you may think someone goes too low, sometimes you may think someone else goes too high, and so you're not going to be bound by that either, but it is helpful.  Thank you.

MS. STARR:  Yeah.

MR. FLOOD:  Thank you, Your Honor.  We think the 3553(a) factors strongly support a below guidelines sentence in this case.  And starting with Mr. Rahbar's history and characteristics, he has been a law-abiding citizen, a contributing member of our community, and generally a kind and generous person throughout his life.

The many letters submitted in support of a lenience in this case attest to a man who's been charitable, decent, and giving to the people in his orbit since he was a little boy.

He's been a devoted son and a good friend and an inspirational boss to countless people, hundreds of people.

In his adult life Mr. Rahbar has become a hardworking entrepreneur who built several innovative businesses that were successful and he prospered, but he always gave back to his community.

The crime is an aberration and it's not reflective of Mr. Rahbar's true character.  The documents and information we provided in our sentencing papers attest to the fact that he has been a very good friend, a good son, a very good boss, and has done good works beyond what would be expected of people in his capacity.  Most of the letters talk about instances where Mr. Rahbar went out of his way to people in need in crisis in their lives to lift them up and do kind things.

He also has done a lot of charity anonymously, not something he seeks credit for, because that's his value system. He provided a positive atmosphere to work in, and a lot of people had great loyalty to him as evidenced by the letters and presence of many of those people in court here today.

Mr. Rahbar has been especially generous with friends and employees when they faced the most trying times in their lives, even when he himself was struggling.

Dozens of these witnesses recount how Mr. Rahbar's kindness and support altered the trajectory of their lives in a very positive way.  He was the indispensable friend that

people -- who people called on when he was in need, and he'd always set aside his life, his obligations to help people recognizing their crisis.

These are no small things, but we don't offer them to negate the crime. They, I think, are the reflection of his true character exhibited over the course of his first 40 years, and they reveal that his offense conduct is truly out of character and warrants a degree of mercy.

His consistent conduct over the vast majority of his life shows that this offense is an aberration and it will not occur and warrants a variant sentence. Mr. Rahbar is very remorseful. He's accepted complete responsibility for his offense and expressed genuine remorse to this Court in his letter and in accepting responsibility in this severe punishment that follows.

He's not only acknowledged his crimes, but has spent the last few years reflecting how he became so off track and alienated from his true values.

His letter is heartfelt and contrite. It acknowledges that he is a work in progress, and he is treating this prosecution as a reset for the rest of his life. He's well-aware that his need to be successful, coupled with personal and professional crisis, contributed to his impaired thinking and led him to justify his crimes at the time, but he knows, and he stands before you guilty because there is no justification, and he offers none. Instead he offers pure contrition and his

intention to atone and make amends for his actions.

Raymond's remorse is not situational. He's not expressing contrition because he got caught. His remorse reflects his awareness that he did wrong legally, and he's remorseful because his actions violated his own morals and beliefs. He understands he'll be punished severely and he accepts that. Genuine remorse has been widely recognized by courts as an important basis for varying downward at sentencing, and we ask the Court to give his severe apology and contrition significant weight when it imposes a sentence in this case.

Mr. Rahbar has no prior criminal record. This is consistent we think with his true character. He has no history of violence. Because of that absence of a criminal history, Mr. Rahbar has never been incarcerated. That means that any period of incarceration imposed by this Court will be far more impactful on him than some of the similarly situated defendants, some of whom we cite in our papers, who have previously served a custodial sentence.

Both of these factors strongly mitigate this crime, and they're empirically supported indicators that he is a low risk of recidivism.

The community support in this case is a strong indicator that Mr. Rahbar will not re-offend. That's based on empirical evidence and case law. The letters and the attendance of these witnesses today show that Mr. Rahbar has a strong rooted

community of support, which is one of the most protective factors against recidivism.  The people supporting Mr. Rahbar come from all walks of life.  They have admired him and remained friends with him since his arrest.  They are not, however, naive to a person.  They are aware of the seriousness of Mr. Rahbar's offense, and with open eyes and open hearts they are showing their support because they truly understand that these offenses are out of character.  Many of these people stand by Mr. Rahbar because they know he is a good man who's seeking to atone for his crimes.

Strong community support has long been recognized as appropriate for a basis of a variant sentence because they are the most important buffer against re-offense.  This strong community has supported Mr. Rahbar through these struggles, and they will be with him when he reenters society.  The nature and circumstances of this offense, we submit support a variant sentence as well.

In 2019 and 2020 Mr. Rahbar was gearing up for the opening of his dream, a technologically advanced all-in-one fitness center, when he suffered a series of personal and professional crises that threw him into a desperate and panicked state.  Due to these stressors, particularly his father's death and the impact of the COVID pandemic, Mr. Rahbar went seriously off track and committed the offense conduct.  He lied to get money.  He defrauded the government.  He used the money to prop up his

failing business.  His actions made everything worse and caused a personal catastrophe, which is this case, but Mr. Rahbar's motivation I submit was not greed.  He was not -- he was motivated instead by impaired belief that he could save a failing business, and he just identified it by saying the ends justified the means.  He could not let go of his dream and he committed crimes, many crimes, and a lot of lies.  We don't shy away from that.

But the image presented by the government today in court does not really match the facts of this case.  Mr. Rahbar had poured all of his personal capital into making BYNDfit his dream and to make it a reality.  And he struggled when his father died.  He did not deal with that.  He suppressed those feelings, and he also took on his father's business and became the primary emotional support and financial support for his mother.

Less than a year later, just before he was scheduled to open BYNDfit, the pandemic hit, compounding the crisis he faced.  Raymond was desperate to keep the business moving and made a myriad of bad criminal decisions in the process.  But I submit he committed the fraud out of desperation and impaired judgments, not greed.

The facts of this case are unique because they show that this was a legitimate business.  It was a winning business model, and he put employees in place and was in the process of hiring more to make it a success.

He put a significant amount of his own money into the business and reached out to people to make it successful.  By the government's own forfeiture calculation, Raymond pocketed less than 300,000, and half of that was given to his mother.  That's a fraction of what the government is arguing in actual loss here.

We think that these factors, the circumstances of the offense, strongly support a variant sentence.  The need to promote respect for the law and the need to reflect the seriousness of the offense also support a variant sentence.  Mr. Rahbar's age, education, lack of a prior criminal record, significant rooted community support, exemplary work history, and the length of this -- of time since this offense happened demonstrates that the risk of recidivism, based on empirical factors, is very, very low; but it's the certainty of punishment which deters crime, not the severity.

Mr. Rahbar understands he's going to prison for years.  We've asked for years in this case, and that is going to satisfy both specific and general deterrence.

The Court has touched on, and so has the government, the various cases that we cited.  I also accessed the FSIN data.  After doing a national search in which I found numerous cases of more egregious conduct nationally where people were getting approximately this amount of time for the base offense level in a CHC1, I found the cases that were most applicable were the ones that arose in this jurisdiction.  It doesn't help the Court to

find an anomalous case in Houston where the crime was 45 million and the person got 12 months. Those cases exist.

I picked cases where the person involved in the fraud scheme was most similarly situated with Mr. Rahbar in terms of the role that he played.

And all of these cases, *U.S. versus Ruden*, *U.S. versus Rosenberg*, *U.S. versus Magee*, and *U.S. versus Ouedraogo*, all involved people who conceived of the loan schemes, the fraud themselves, and executed it.

Ruden was someone who had just gotten out of prison, was on supervised release for a prior crime involving a fraud of $40 million. He developed this PPP loan tax fraud and filed 80 fraudulent loans. The loss amount in that case totaled 43 million just on the PP (phonetic) loans themselves. There's other -- an additional 19 million on the tax fraud. He personally collected $4 million, and then, after pleading guilty, he lied to the probation officer to avoid detection for other crimes. The probation officer's recommended sentencing guideline range was 151 to 188 months, and he was sentenced to 60 months for the loan fraud part of his scheming, not 80 months, 60 months. It's right in the heartland of what the FSIN data suggests.

Rosenberg was less egregious but still filed 16 fraudulent PPP loans, causing --

THE COURT: That last case you referenced that was 66

months -- 60 months on one aspect, was that the case where in total the person got 120 months?

MR. FLOOD:  120.  Two different schemes, and the judge gave him 60 on both to run consecutive.

Rosenberg, 16 fraudulent PPP loans, $9.4 million in loss, and he personally received 1.6 million.  Like three of them, he was hit with several enhancements, including sophisticated means.

I'm just going to call out the fact that the government keeps talking about how sophisticated this operation was, but they have not asked for the Court to find that sophisticated means were used here, nor has the probation office recommended it.  Three of these defendants were tagged with that because their schemes were significantly more sophisticated.  That doesn't mean it wasn't criminal, but they're trying to have it both ways.  They haven't jumped through the hoop to show sophisticated means, but implicitly they're asking the Court to find that it was sophisticated.

Mr. Rosenberg's offense, despite numerous enhancements and, you know, triple -- about triple the loss amount, was 63 months.

Bennie Magee, you know, engaged in 30 fraudulent loans. He did PPP loans and economic injury disaster loans, and he obtained $7 million of which 5 million went to him.  He used this money, not to prop up a failing business, as the government seemed to suggest.  He invested it in crypto.  He saw himself as

getting rich.  He bought luxury vehicles and spent money on vanity projects.  He exploited unsophisticated friends and family to get them to help him hide his criminality, and he personally benefited from 5 million.  The United States Probation Office also recommended an obstruction of justice charge for him and a guideline range of 168 to 210 months.  His sentence was 60 months, not 60 to 80, 60 months.

Both of those offenders were far -- or all three of those offenders were far more culpable and committed more egregious acts than Mr. Rahbar.

*Ouedraogo* was a serial fraudster who committed at least four different fraud schemes, including the ultimate PPP loan fraud over the course of a decade.  He filed at least 16 fraudulent PPP loans.  The loss amount was 9.3 million, and he personally benefited at $384,000.  He received a sentence of 36 months imprisonment.

Each much these defendants filed more fraudulent loan applications that Mr. Rahbar.  He filed 13, and some filed as many as 80.  Each of them obtained more money through the course of their fraud than Mr. Rahbar, sometimes at a multiplier of 11. Each was primarily motivated by greed.  Mr. Rahbar was not.  All four received significantly more money and many exponentially more.  Three used sophisticated means, and two had previously committed frauds, one obstructed justice and -- to avoid detection.

Despite every one of these defendants engaging in more serious conduct and committing more fraud, the average sentence of all four of them was 55 months.  The government and the Probation Offices asked for basically triple of that.

In their response today they don't talk about the two comparable cases of Mr. Rahbar's co-defendants.  I think those are totally inappropriate for consideration in this case because Mr. Rahbar has taken significant responsibility that, by his own actions, distinguishes wishes from those defendants which shows that they're not similarly situated.  We think we've shown you the similarly situated defendants in cases, and they argue for a significant below guideline sentence.

Mr. Rahbar's crimes are no doubt serious and deserve punishment; however, he is a first-time offender who has taken decisive actions to atone for his crimes.  He is of extremely low risk of re-offense, and any period of incarceration will be extremely impactful on him.

The sentencing ranges recommended by the government and the probation officer are excessive and extreme, and would result in a period of imprisonment far greater than necessary to address the 3553(a) factors because it would be approximately three times greater sentence than similarly situated defendants who stole far more money and engaged in significantly more egregious conduct.

We ask the Court to impose a sentence of 36 months.

THE COURT:  Mr. Rahbar, sir, this is your opportunity to

address the Court if you would like to.  I did read the letter that you provided to the Court.  I read all of the letters that were written on your behalf, but if there's something more that you would like to consider, I'll consider it now.

THE DEFENDANT:  Just a short statement, Your Honor.

THE COURT:  Um-hmm.

THE DEFENDANT:  I apologize.  Normally I'm actually a decently good public speaker, but I had to write this down just because it's a little difficult to get through.

Your Honor, I don't think words in this case will particularly do justice to what I'm feeling or the immense shame I am feeling, but I do want the Court to know that I'm truly sorry for the absolute mess that I've caused with all my actions.

In my letter to the Court, I tried my best to explain how I rationalized my actions at the time, not because I believe there's a justification, but rather to help Your Honor understand the compromises I kept making went from small to small to large to larger.  The small -- the small exaggerations and justifications led to bigger ones, and ultimately I took advantage of a government program that was designed to help our country during a terrible time.  And I justified it to myself because I was desperate and was watching my dreams implode with all the businesses.

Your Honor, I'm truly sorry for all my actions.  My actions were selfish, and I deeply regret all of my actions

related to these crimes.  I know I will be punished, but my remorse is not because of the sensitivity of going to imprisonment, but because my actions violated my core values and disappointed those that believe in me and support me.

In the end my actions were a betraying of my family, friends, and who I want to be.  I know my apologies do not undue any of my actions or the harm my actions may have caused, but I am hoping that by admitting my actions and crimes, I can more fully atone for the harm I've caused and begin the road to redemption.

Thank you, Your Honor.  I appreciate the time.

THE COURT:  And I appreciate your words that you expressed here --

No, I'm not done.  You can come back.

THE DEFENDANT:  Oh, sorry, Your Honor.

THE COURT:  -- in your letter as well as what you said here in open court.  Okay?  And I've said it many times that no one is ever the worst thing that they've ever done.  Okay?  I appreciate that there's more to you.  Okay?  That's reflected in those letters, you know, ones written by your mother, people who knew you, knew your father when you first came to the country, known you your whole life.  I appreciate that.  Okay?

THE DEFENDANT:  Thank you, Your Honor.

THE COURT:  You said something in your letter about how you have disgraced your father's name.  You may not be -- you may

be ashamed of what you have done, but I don't think he would see it that way.  Okay?

THE DEFENDANT:  Thank you, Your Honor.

THE COURT:  Part of taking responsibility is dealing with the consequences of your actions.  Okay?  It wasn't the government's job to fund your business.  Okay?  A lot of businesses imploded during this period.  I'm not even getting into what the government was saying whether or not yours was already going in that direction or not.  I'm not.  That doesn't in any way make any of this okay, and we are talking about a lot of money, a lot of money.  Even in the Statement of Facts, 3.1 million, and there was more that you wanted but did not get. And you took advantage of a program, as you said, that was intended to help people.  Okay?  And you have to deal with the consequences of that.

I want you to appreciate, though, that this is only a -- or it can be just a blip on the radar for you.  You can rebound from this, right?  You can live that kind of life and be the person that all of those individuals described, but you have to deal with the consequences of your actions.  Do you understand?

THE DEFENDANT:  I do, Your Honor.

THE COURT:  This is a moment in time for you, and so you have got to deal with it and move on from it.  That is how you make the man whose name you carry proud, by dealing with the consequences and how you deal with them from this point forward.

Do you understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  You can be seated.

THE DEFENDANT:  Thank you, Your Honor.

THE COURT:  And so I've reviewed the presentence report and the position papers of the parties and all of the letters mister -- I've been calling you Mr. Rahbar, but I noticed your counsel says Rahbar.  Which is proper?

THE DEFENDANT:  Rahbar, Your Honor.

THE COURT:  Rahbar.  Let me write myself a note.  I'll try to write it out phonetically.  Forgive me if I mess it up.

The letters, your allocution today, and the 3553(a) factors, and you know how serious this was.  Okay?  It wasn't just a moment of in time because this took place over a year, and there were many things, many steps you took along the way in this process in committing this crime.  Okay?  Some people call things like this a mistake.  It's not a mistake.  Okay?  A mistake is when you don't really know, hey, or don't even understand or appreciate.  You fully appreciated it here.  This was bad judgment.  It was a decision that you made, and it was a decision you made to do the wrong thing repeatedly.  Okay?  That is not a mistake.  That is conscious conduct.  Okay?

It's a lot of money.  We're talking in the millions.  And you using these kids' information on this paperwork is a problem.  Okay?  The consequences you caused to all these other people in

terms of their tax implications is a problem.  I appreciated in your letter that you apologized to some of those individuals.  Okay?  I appreciated that.  That is a sign of remorse, because it's not just "Me, me, me.  This is what I did.  This is what I was going through," but even in your letter to apologize to the Court, but to apologize to all of the individuals that you impacted.  So, in terms of the seriousness of the offense, very serious.

Moving on to your history and characteristics.  Your letter that I just referenced speaks more to that, what it reflects about you.  That showed me introspection.  You don't have a criminal record.  Like I said, I don't -- I do think that this was conduct that was not in keeping in who you were before.  But to me aberrational conduct is that which happens one time and is shocking and surprising, but when you do something over the course of a year, a little over a year, I don't -- I don't really see that as aberrational, but I do understand that there's much more to you than just this crime.

I -- the crime also needs to speak to the need -- or the sentence must speak to the need to promote respect for the law and for deterrence.  I'm also concerned about your personal deterrence.  I don't think you will be in this position again, but there is something to be said about deterring others from engaging in this conduct and taking advantage of programs like this.  It was such a terrible time for this nation and everybody

in it, and the government was doing something to help people, and so when someone takes -- comes along and takes advantage of that, it's a problem, and a sentence should deter that.

What really resonates with this Court in terms of these factors is the need to avoid unwarranted disparities here, and your attorneys did a good job of pointing to these other cases. I said before, sometimes you may -- you may -- one judge may or may not -- it's really not my place to agree or disagree with another judge's sentence. It's not my place, but we don't necessarily always see everything the same. But when you have things across several, and there's a goal of keeping sentences aligned for similar conduct in defendants who are similarly situated, we must.

And so I've taken all of those things into consideration, and I'm ready to pronounce sentence. I do think a variant sentence is appropriate in this case, given, especially this need to avoid unwarranted disparities, not to the extent that your attorneys think, but I do think a variance is somewhat appropriate here.

And so in taking all of these things into consideration, it is the judgment of the Court that the defendant, Raymond Rahbar, Jr., is hereby sentenced to the custody of the Bureau of Prisons for a period of 30 months imprisonment as to Count 1, and it's 24 months of imprisonment as to Count 2 consecutive to Count 1. Upon your release from incarceration, you shall be

placed on a supervised release term of three years.

Mr. Flood, did you review the mandatory conditions of supervised release?

MR. FLOOD:  Extensively, Your Honor.

THE COURT:  Okay.  As well as the standard conditions and special conditions that were all outlined in the presentence report?

MR. FLOOD:  Yes.

THE COURT:  I'm imposing all of those, Mr. Rahbar.  Okay? I'm not going to read each one out, but I'm imposing all of those.

The mandatory conditions of release, you've reviewed those?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  The standard conditions and the special conditions, you reviewed them all?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  So all of those imposed.  The reason I'm imposing the special conditions is because this was a financial crime and there are -- restitution is -- will be ordered in this case, and your finances need to be monitored, and you need to make these payments, and those special conditions speak to those. Okay?

I am also ordering that you pay the $100 special assessment per each count of conviction.

I'm not awarding or imposing a fine or the cost of incarceration, given the restitution that is -- will be ordered in this case.  I find that this sentence is sufficient but not greater than necessary to achieve the goals of sentencing outlined in 3553(a).

You had a recommendation, I believe, close to the Northern Virginia area?

MR. FLOOD:  Yes, Your Honor.  We've asked for FCC Cumberland if he qualifies.  If he doesn't qualify, we'd ask for the facility closest to Northern Virginia.

THE COURT:  Okay.  I will do it in that order.

MR. FLOOD:  Thank you.

THE COURT:  Okay.  Mr. Rahbar, I also need to advise you of your right to appeal.  If you're going to appeal your sentence and conviction, you have to do so within 14 days and in writing. If you don't do it in writing within that timeframe, you will have waived your right to appeal.  Do you understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Good luck to you.

MR. FLOOD:  Your Honor, there are a couple of matters, if we could.  They're sort of housecleaning.

THE COURT:  Okay.

MR. FLOOD:  We would ask that the sentencing order reflect a recommendation that Mr. Rahbar, if eligible, can benefit from community corrections.  That's a halfway house transitioning back

to society.

THE COURT:  Okay.  I'm going to let BOP deal with that.  I saw that in your papers.

MR. FLOOD:  Thank you, Your Honor.  We're also asking for Mr. Rahbar to voluntarily surrender.  As the government has alluded to, he has a stack of things he has to do, including clearing up all the tax matters.

THE COURT:  Well, I should -- I neglected to say that the restitution order will be incorporated into the judgment.

MR. FLOOD:  That's right.  That's one of the things we are going to have to meet on.  We're going to have to have a separate hearing we think about two months.  Mr. Rahbar has seven trials scheduled between now --

THE COURT:  I thought you all -- you all did waive that 90-day provision in your plea agreement.

MR. FLOOD:  That's -- that's right.  We're asking for a voluntary surrender date of January 12th, 2026.  That's a reasonable estimate of the time it will take for him to clear up all of his tax matters and deal with all of this other civil litigation for us to have the restitution hearing.  We don't anticipate that he would ask to extend it beyond January 12th.

THE COURT:  Okay.  So for the restitution hearing January 12th?

MR. FLOOD:  I was thinking something before then, but we could do it in January if that's better for the Court.

THE COURT:  Well, what were you referencing January 12th for?

MR. FLOOD:  He has seven civil trials.

THE COURT:  Was that your request for self-surrender?

MR. FLOOD:  Self-surrender on the 12th.

THE COURT:  I'm going to have to give that one some thought.

MR. FLOOD:  Okay.

THE COURT:  Okay.  Ms. Starr.

MS. STARR:  Yes, Your Honor.  Just briefly.  As Mr. Flood alluded to, we would ask for something about 60 days out.  I realize that puts us right around Thanksgiving.  I personally have a December 1st trial, but something within that timeframe. We have been endeavoring to work it out and believe that should work.

The other thing I believe is Mr. Flood has a consent order of forfeiture to hand up.

THE COURT:  And that will be incorporated and made part of the judgment.

MR. FLOOD:  That's right.  Mr. Rahbar has signed that and accepts his obligations for the record.

MS. STARR:  And I apologize for the double-sided printing on that, Your Honor.

And the last thing is pursuant to the plea -- the terms of the plea agreement, Your Honor, the government would move to

dismiss the remaining counts of the indictment.

THE COURT: Okay. And your order should also reflect the underlying indictment, too, when you do it.

MS. STARR: And that's the superseding indictment and the underlying indictment?

THE COURT: Yes.

MS. STARR: Yes. Understood, Your Honor.

THE COURT: That's the order, and if you submit that, I'll endorse it, and I'll endorse the consent order of forfeiture.

Okay. With respect to this self-surrender, I'm not doing January 12th. I'm not giving anybody that much time. Okay? I'm going to do, normally it's just the two months, and that's what I'm doing here.

In terms of a date for doing -- will we need to -- will you all not be in a position to hand up a restitution order? We have to set a hearing date?

MR. FLOOD: I think it's prudent to set a hearing date. It's our hope do reach agreement on this and submit it to the Court, and if we are able to do that, we can then move to have the hearing date removed.

THE COURT: Okay. So it's the 25th. I will set it for November 20th.

Okay. Is there anything else?

MR. FLOOD: Is that at 10 a.m.?

THE COURT: 9 a.m.

MR. FLOOD:  Thank you.

THE COURT:  It's the normal criminal docket.

Is there anything else?

MS. STARR:  Nothing from the government, Your Honor.

THE COURT:  Thank you.

MR. FLOOD:  Thank you, Your Honor.

(Proceedings adjourned at 10:48 p.m.)

# C E R T I F I C A T E

I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Scott L. Wallace                    10/3/25
-----------------------------          ----------------
**Scott L. Wallace, RDR, CRR**              **Date**
   **Official Court Reporter**