UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **Plaintiff,** | : | Criminal Action |
| | : | No. 24-180-PTG |
| **v.** | : | |
| | : | Court of Appeals |
| **RAYMOND RAHBAR, JR.(1)** | : | No. 25-4546 |
| | : | |
| **and** | : | |
| | : | February 26, 2025 |
| **RYAN MACAULAY (2),** | : | 10:13 a.m. |
| | : | |
| **Defendants.** | : | |
| | : | |
| ............................. | : | |

**TRANSCRIPT MOTION HEARING PROCEEDINGS
BEFORE THE HONORABLE PATRICIA TOLLIVER GILES,
UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the United States:      **Christopher J. Hood, Assistant
U.S. Attorney**
UNITED STATES ATTORNEY'S OFFICE
EASTERN DISTRICT OF VIRGINIA
2100 Jamieson Avenue
Alexandria, VA 22314
703-299-3700
Email: Christopher.hood2@usdoj.gov

For Defendant Rahbar:      **Joseph Thomas Flood, Esq.**
THE LAW OFFICE OF JOSEPH T. FLOOD
10621 Jones Street
Suite 301-A
Fairfax, VA 22030
703-691-8410
Fax: 703-251-0757
Email: Jflood@sfhdefense.com

```
APPEARANCES:   (Cont.)

For Defendant Rahbar:         Patrick F. Stokes, Esq.
                              GIBSON, DUNN & CRUTCHER LLP
                              (DC-NA)
                              1700 M. Street NW
                              Washington, DC 20036
                              202-955-5800
                              Fax: 202-467-0539
                              Email: Pstokes@gibsondunn.com

                              Alyse Wren Ullery, Esq.
                              GIBSON, DUNN & CRUTCHER LLP
                              (DC-NA)
                              1700 M. Street, NW
                              Washington, DC 20036
                              202-955-8500
                              Fax: 202-831-6126
                              Email: Aullery-glod@gibsondunn.com

For Defendant Macaulay:       Rammy George Barbari, Esq.
                              PRICE BENOWITZ LLP (DC)
                              409 7th St NW
                              Suite 200
                              Washington, DC 20004
                              202-417-6000
                              Fax: 202-664-1331
                              Email: Rammy@pricebenowitz.com


Court Reporter:               Scott L. Wallace, RDR, RMR, CRR
                              Official Court Reporter
                              United States District Court
                              401 Courthouse Square
                              Alexandria, VA 22314-5798
                              Cell: 443-584-6558
                              Email: Scottwallace.edva@gmail.com
```

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

**MORNING SESSION, FEBRUARY 26, 2025**

THE COURTROOM CLERK:  The Court calls *United States of America versus Raymond Rahbar, Jr. And Ryan Macaulay*, Case Number 1:24-cr-180.

May I have appearances, please, first for the government?

MR. HOOD:  Good morning, Your Honor.  Chris Hood on behalf of the United States.

THE COURT:  Good morning.

MR. BARBARI:  Good morning, Your Honor.  Rammy Barbari on behalf of Mr. Macaulay, who is present.

THE COURT:  Good morning to both of you.

MR. FLOOD:  Good morning, Your Honor.  Joseph Flood on behalf of Mr. Rahbar.

MS. ULLERY:  Good morning, Your Honor.  Alyse Ullery also on behalf of Mr. Rahbar.

THE COURT:  Good morning.

MR. STOKES:  Good morning, Your Honor.  It is a pleasure to appear before you.  Patrick Stokes on behalf of Mr. Rahbar.

THE COURT:  Good morning to you.  Mr. Hood, I will let you know that Mr. Stokes and I served in the U.S. Attorney's Office together and we were law school classmates.  That doesn't mean I won't rule against him.

MR. STOKES:  I hope that's not a prediction of what's to come today, but certainly not expecting favor or anything else.

THE COURT:  Good morning.  Do you have something else,

Mr. Hood?

MR. HOOD:  No.  I did not know if you had an idea of how you wanted to proceed concerning these motions.  I have certain proposals that I think might help the process, but I defer to the Court.

THE COURT:  Okay.  Well, if you have something that would streamline -- have you discussed it al all?

MR. STOKES:  We haven't, Your Honor.  So we're certainly happy, Your Honor, to propose an order to go through them, but we have not discussed what is apparent interest in proceeding --

THE COURT:  Okay.  Well, let's hear -- Mr. Hood, let's hear from you.

MR. HOOD:  Well, Your Honor, I think this is relatively straightforward.  There are just a few things that I think we can, for purposes of the record, make sure -- that have already been resolved.  So ECF Number 47, which is Rahbar's motion for more motions, which I believe has already been denied.

There is ECF Number 51, which is Rahbar's motion to file under seal, which has already been granted.

And then, of course, there's Mr. Macaulay's motion to join several of Mr. Rahbar's motions, which I believe has already been granted in that respect.

So I don't think we need to deal with any of those.  My proposal, as far as order, is to group them into, essentially, three buckets.

The first bucket would be the discovery motions which would be ECF Number 58 -- excuse me, 48, 53, 54, or what I'll refer to as the-government-did-not-give-me-enough-materials motions.

Then I suggest we do the second bucket, which is the particularity motions, which would be ECF Numbers 49 and 50, which I'll refer to as the-government-gave-me-too-much motions.

And then finally, I propose that we go with the substantive motions, which is the James hearing, the motion to dismiss, and the suppression motion.

So, if that's acceptable to you, that's the order I would propose.

THE COURT:  And Mr. Stokes, and I don't know how you all split up your arguments.  Did you all do that?

MR. STOKES:  We, did Your Honor.  What -- obviously Gibson -- I shouldn't say obviously.

Gibson Dunn came into this case a little late as pro bono counsel for the FPD's program, and so Ms. Ullery is a very experienced associate, mid-level associate.  She's going to handle two of the arguments, the suppression motion and the motion to dismiss.

I'm a bit of an afterthought, but I'm going to handle the Bill of Particulars, and Mr. Flood's going to handle the discovery motions for us.

Mr. Barbari is going to handle their one motion, I

presume.

THE COURT:  Okay.

MR. STOKES:  And so, Your Honor, we're happy to proceed however -- we thought we would begin with the substantive motions, the Bill of Particulars, and then work through the motion to dismiss --

THE COURT:  I'm going to have you all go through in my order so we can keep it in the order that I have looked at things.

And what I plan to start with were some of the discovery-type motions; then move into the Bill of Particulars; and then I'll take up the motion to dismiss and the suppression motion last.

MR. STOKES:  That's great.  Mr. Flood is going to handle the discovery motions, and then I'll come back up.

THE COURT:  Okay.

MR. FLOOD:  Thank you, Your Honor.  The first motion I would like to address, unless the Court --

THE COURT:  And I will say, we're going to take them all as a group so we're not going to have ping-ponging back and forth.

MR. HOOD:  To clarify, you mean you want to ear everything that they have to say.

THE COURT:  No.  I'm going to hear all of his arguments as to all of the discovery motions that he is doing, and then you

can respond to all of those.  And then we'll go back for them to have their final argument.

MR. HOOD:  Understood.

MR. FLOOD:  Thank you, Your Honor.

Docket number 53 is our first specific *Brady* motion. We're asking for four classes of evidence related to employees, proof that work was performed at the companies at issue, the entities; proof that payments were made; and proof of nonfinancial compensation.

As the Court is well aware, the government has been investigating this case for nearly three years.  It's interviewed dozens and dozens of witnesses.  And it's our belief, as we advanced to the government orally and in writing, that a significant amount of that material was exculpatory.

This Court entered a Rule 5 discovery order in August, despite our request that was not forthcoming until the hearing that we had when Mr. Rahbar was arraigned on the first -- or the first superseding indictment.

We have had some additional --

THE COURT:  That's not unusual, for discovery to start at the time of arraignment.

MR. FLOOD:  Well, there was an original arraignment on this earlier, and that was when the Court entered the discovery order.  We didn't get the materials that are responsive to this --

THE COURT:  Are you talking about when there were attorneys moving in and out?

MR. FLOOD:  Um --

THE COURT:  At what point is this?

MR. FLOOD:  I think the Court entered the discovery order in August, and I communicated with Mr. Hood several times.  After my appointment, he provided a number of productions.  There were issues about it being corrupted or inaccessible.  He worked to get that material, but specifically, as it relates to exculpatory evidence, we've been asking for information that we think is exculpatory because it shows that people were working, people were being paid; that there was payroll expenses and other compensation; that work was being performed.

Their position, their theory at least that they've articulated to us, is that most, if not all, of these entities were fraudulent entities, so evidence that people were being paid and compensated for work that was being performed is exculpatory.

Mr. Hood has never disagreed with that, but what's happened over the course of this case is he's told us several times, after giving us the production on November 20th, that you have everything in my file.

And we've taken the position that that's not sufficient, that what is in your file wasn't the complete universe of *Brady* information.  You have to do a diligent search to collect additional exculpatory evidence.

THE COURT:  But what do you mean by "a diligent search"? Do you mean go back to the law enforcement agencies and ask them --

MR. FLOOD:  Absolutely.  Absolutely.

THE COURT:  How do you know that that has not occurred?

MR. FLOOD:  He's had numerous opportunities to tell us that it's occurred.  He hasn't told us that.  In our phone conversation earlier this week, we articulated our theory that that is his obligation.  He did not agree -- he didn't disagree, but --

THE COURT:  But did you articulate it as you just articulated it to me?

MR. FLOOD:  Yes.

THE COURT:  Meaning that you have to go forth and do your due diligence and find it?  Because that almost suggests that you have to do more than just talk to your law enforcement partners. That almost suggests that you have to go out and do our job and find exculpatory evidence just out in the universe.

MR. FLOOD:  That's not the context in which it came up.

THE COURT:  Okay.

MR. FLOOD:  We told him he had to make a diligently inquiry of any law enforcement --

THE COURT:  -- okay --

MR. FLOOD:  -- entity that has been involved in this investigation.  And during our conversation he said, Do I have to

talk to the Fairfax Police Department?  And we had a long discussion about whether or not he has an obligation to secure information, if it's exculpatory, from the Fairfax Police Department.  I told him what my understanding under *Brady* was, which is, if Fairfax has been involved in this investigation and are the functional agents of the U.S. government in this investigation, you absolutely have to do that.  If they're not, probably not.

He hasn't ascribed to that view.  He hasn't said that he agrees with us, but we think that's what's lacking.  He hasn't certified that those requests or inquiries have been done.

Following our conversation on Monday, we provided him with a detailed letter in which we articulated specificity the materials that we think exist that are not in his file or potentially not in his file.  He hasn't responded to that letter. We don't expect in two days that he would respond to that letter, but just to bring the abstract to very, very concrete, we think that this information exists, and he hasn't certified that he has done those inquiries.  So that's part of the request that we're making, that he makes a reasonable effort to secure favorable information, *Brady* information from all of the entities that are involved in this investigation.

And as to this material, as well as to any other *Brady* material, that he provide it in a reasonably prompt matter.  I don't think 92 days is reasonably prompt.  We shouldn't have to

wait until trial to get this, and we're asking for the Court to direct him to do that.

THE COURT:  Well, I've already directed them to provide *Brady*.

We'll see what he says as to this, because maybe today he can clear this up and put these representations on the record so that you are clear that it has been done.

MR. FLOOD:  Thank you, Your Honor.

The second discovery motion, which, in all honesty, I thought was pretty straightforward, was a motion for *Brady* evidence of nontestifying -- impeachment evidence of nontestifying hearsay.

THE COURT:  Why is that straightforward?

MR. FLOOD:  What's that?

THE COURT:  I said mwhy so?  Why is that straightforward?

MR. FLOOD:  Because *Brady* doesn't distinguish between witnesses who are testifying and witnesses who are not testifying.

THE COURT:  But let's not talk about *Brady* -- sometimes impeachment can be *Brady*; sometimes it can, but sometimes impeachment is just impeachment.  And under the rules -- you're right, you can impeach a nontestifying declarant, but that does not mean that they have the obligation to go out and find you impeaching evidence on that declarant.

MR. FLOOD:  Respectfully, I disagree, and we have cited

numerous cases where the circuit courts and district courts have said this is very straightforward.

If the government has in its possession impeachment information against the nontestifying witness, they can't shield it from the defense by not calling that witness. They have to disclose it.

THE COURT: I looked at your cases, and I don't believe they're on point on this.

MR. FLOOD: Well, if you have any more questions about that, I think it's straightforward --

THE COURT: They always -- you always do. You always do. Go on to your next argument.

MR. FLOOD: Just with respect to the first argument and the second argument, critically there's no prejudice to the government to turn this information over to the defense.

The third argument relates to our request under 801 --

THE COURT: If they do have something, I do think they have a duty to disclose. But if they don't have it, I don't think they have a duty to go out and obtain that for you, okay? If they do not have it, I don't think they have the affirmative obligation to go out and secure it for you.

MR. FLOOD: Well, getting down to brass tacks, if it's in the possession of the FBI and not in his --

THE COURT: We've already covered that scenario, right? If they have things that are in the possession of their law

enforcement agencies, that is different, but they don't have the obligation to go out and secure additional --

MR. FLOOD:  Understood.  They're under no obligation to do our investigation.

As it relates to some of their witnesses, we understand that they are -- there are whistleblowers in this case, and that those agents of the government have provided information and may, in fact, possess additional information.  This is laid out in our letter.

We think they're under an obligation to also secure that information because that person is an agent of the government by their status as a whistleblower.

THE COURT:  I will hear them on that.

MR. FLOOD:  The third discovery motion is a request to have the government identify statements that they are going to attribute to Mr. Rahbar and seek introduction pursuant to federal rule of evidence 801(d)(2).  We're asking for this information 30 days before trial.

This case has been declared complex.  The evidence in this case is voluminous.  We actually haven't finished reading all of the discovery.  We're getting closer to that, but within the evidence are thousands and thousands of pages of civil lawsuits and civil litigation, some in bankruptcy, some in D.C. Superior Court, some in Fairfax Circuit Court, some in EDVA, and there are literally tens of thousands of potential statements that the

government might rely upon.  We are asking for them to define the universe of those statements so that we can make a thoughtful investigation of those statements and bring motions in limine, if we believe they're irrelevant or otherwise inadmissible.

The government's response really is that there's no authority for this.  And again, I disagree with that forcefully. I think this Court has authority, both under Rule 16 in its inherent authority to direct the government to identify the class of statements that they want to introduce to save the defense the enormous amount of time it will take to master those, anticipate what statements they might seek to introduce, and do an in limine practice.

If there are two hundred statements or 200 pages of statements that he knows that they're going to seek to introduce or are the universe, there's no prejudice to the government to identify those here, but significant time will be invested by the defense understanding and trying to figure out which ones they might introduce and develop legal theories as to why they're excludable.

The cases I cited from this district and other districts involve significantly less discovery material or significantly less complicated fact patterns and voluminous evidence, yet the courts in those cases have directed the government, even when they've made efforts to narrow it down to provide more.

This is *U.S. versus Tree*, 21 Fed Supp. 3d.  It's a D.C.

district court case:  "A defendant faced with false statement charges should not have to waste precious pretrial preparation time guessing which statements he has to defend against when the government knows precisely the statement it intends to rely upon and could easily provide that information to the defense, it should be provided."  That's all we're asking for.

If he wants to, out of the thousands and thousands of pages, identify a few hundred pages -- the other day he said there would be potentially ten transcripts that would be in that universe.  I can't imagine everything in those transcripts are relevant and admissible.  Give us the page numbers so we can review them.  And if we have motions in limine to exclude them, we would like to do that.

Again, we're asking that this be provided to the defense 30 days before trial.  The last motion that we have for discovery is a request to modify the discovery order.  We're asking that all of the deadlines be moved to March 21st, 2024, and that's for the *Jencks/Giglio/Brady* and expert reports, but also for, critically, the 404(b) information.

In our conversation with Mr. Hood on Monday, he indicated that they have a very lengthy list of 404(b) acts that they intend to offer in front of the jury, and we have a right to investigate those, defend against them, litigate them, and seek their exclusion.  We need additional time for that.  Again, there's no prejudice to the government to provide that a little

bit more in advance, and we're asking the Court to order that.

The discovery order was entered early in this case, and it clearly anticipated the possibility of being modified.  We think there is good cause to modify that to give us a little bit of extra time to review the material, litigate it, and prepare for trial.

Thank you, Your Honor.

MR. HOOD:  Your Honor, before I dive into the specific motions and my responses to them, I think there were two things that Mr. Flood said that really, I think, elaborate what their position is.  And the first is that they want to save enormous amounts of time.  All of these motions, specifically the discovery motions, are designed to ask the government to do the defense's work for them.

They want us to identify the statements for them.  They want more time, which is remarkable, in fact, because of how expansive their team is.  But I think that stuck out as really the theme that is undergirding all of these motions.

And then the second thing that he said, which, again, I'll address before I address the specific motions, is that there would be no prejudice to the government for providing this information, which is -- I'm trying to think of a nice way to say this -- incorrect.  It would extraordinarily prejudice us to not only go out and complete our investigation and complete our trial prep a month ahead of time, but also to provide that.

And I'll give you an example of this.  The 802 -- or excuse me, the 801(d)(2), he focuses his argument and the motions on the voluminous -- the amount of litigation that Mr. Rahbar is involved in, but that's not what the rule actually says. 801(d)(2) is about hearsay statements, and, conceivably, there are hearsay statements that exist anywhere.  Any document that purports to have his name on it or the name of one of his co-conspirators conceivably falls within 801(d)(2).

And so, if they're asking us to identify all those statements, what they're asking for is nothing less than for us to provide them with a list of every single document that we have that not only implicates Mr. Rahbar or Mr. Macaulay, but contains something that they have agreed to, affirmed, asserted, or one of their -- or representatives or co-conspirators have done, which, again, is virtually the entire universe of our case.

So, putting those two aside, I would like to talk about the specific motions and the specific arguments that were raised. For the most part, I will rely on our papers, which I believe some of these issues are briefed extensively, but beginning with the *Brady* motion, obviously the FBI has provided information.  I don't know where they think that the documents that I have provided them have come from, but obviously they've come from the FBI, and we've asked the FBI, as is the normal practice in this district, to provide their case file and to continue to supplement their file, and to provide it to us in discovery as it

happens.  So I'm happy to make that representation to you, to the Court, and the defense.

THE COURT:  But have you -- I think what they want is for you to have specifically, either by conversation or by sending a letter to the law enforcement partners stating this is our obligation.  Please confirm that you have  provided any evidence that could be exculpatory.

MR. HOOD:  So, it has not been done that explicitly.  But, to give you a bit of background, the FBI agent that is on this case is a former lawyer, a practicing lawyer who is a very experienced and is well-aware of her *Brady* obligations.  She was here during the arraignment.  She has seen the *Brady* motions. And I asked her extremely explicitly, if you have something in your case file, I need your case file.

THE COURT:  I know.  I would do that, too.  We all do that.  I did that at a time.  But in terms of -- and the Court has entered its order, and it has advised the government on the record about *Brady* obligations.

MR. HOOD:  Absolutely.

THE COURT:  That discussion should be had with the law enforcement partners, in the way that's not just phrased "give me everything that you have," but to remind them of the obligation and to get assurances from them that they understand and that they have complied and will continue to comply if they uncover additional information.  Do you understand what I am saying?

MR. HOOD:  I understand, Your Honor, and that is absolutely the case.  If it -- we intend to continue to comply with that obligation.

As you can imagine, our investigation is continuing. We -- in our conversations with our various people who have provided documents to us, they may provide additional documents, and we intend to provide all of those to the defense as soon as we get them.

THE COURT:  Okay.  Let me be clear, because it was my practice that I would send an explicit letter to the law enforcement partner that specifically informed them about the *Brady* obligation and that it was necessary for them to comply and to provide those records.  I would send those letters out, and I would get a response back, okay?

I'm saying, that needs to happen.

MR. HOOD:  Understood, Your Honor.  I'm happy to send a letter and have a written correspondence with the FBI --

THE COURT:  And then just confirm.  I'm not saying it has to be -- by letter or e-mail or however you do it, but I'm saying get that -- that is what they are asking for, and I do not think that is unreasonable, so that it is clear that they understand their obligations and also that the U.S. Attorney's Office has communicated that to them.

MR. HOOD:  I am happy to communicate that to the FBI and have the FBI communicate that back to me.

As it relates to sort of an ancillary issue that they kind of mentioned, I don't -- I read the letter that they sent, and it does appear that they have a misunderstanding of who the investigative team includes.

THE COURT: Okay.

MR. HOOD: And I would just note that we intend to comply, which is, I think, the plain black letter law of *Brady* and its progeny to query and obtain information whenever it exists from anybody in the investigative team.

THE COURT: Correct.

MR. HOOD: But we do not believe, and I believe Your Honor has stated the same, that we have an obligation to do that for people who are outside of the investigative team. That is a position that we have briefed extensively in our papers.

It is, I think, an uncontroverted position, and there are -- there is binding Fourth Circuit precedent that speaks to that as well.

Going to the second motion, which is the impeachment evidence of nonwitnesses, Your Honor, I think, hit the nail on the head when you noted that our duty to provide *Jencks* material does not apply to folks who are not testifying. I believe this is moot, to some extent, because to the extent that we have information in the world -- to the extent that the FBI has collected information about any person they have interviewed, whether or not we intend to call them or not, we have turned them

over to the defense.

THE COURT:  So, if there was impeachment evidence in your possession, that has been disclosed?

MR. HOOD:  Exactly, Your Honor.  But again, we do not believe we have a duty to go and seek out information for folks who we do not intend to call and who have not already been interviewed.

As it relates to the 801(d)(2) motion, there is no binding precedent that suggests that this is an inappropriate use of a motion, candidly.

The person who is best positioned to know what was said in these various court proceedings is Mr. Rahbar, and Mr. Rahbar and the defense counsel for Mr. Rahbar have exclusive access to him and to that information.

And so, to the extent there are statements that he has said, either in court proceedings or elsewhere, about his involvement in this case, the only person who knows where all those statements are is Mr. Rahbar.  So we do not believe that it is appropriate for us to go and try to define the universe of 801(d)(2) statements.

There's also, I would note for the Court, to the extent that it matters, that if we intend to introduce into evidence an 801(d)(2) statement, of course we would provide that, not only in discovery, but it would be listed on our exhibit list so they would have advance notice of it and an advanced opportunity to

challenge that evidence, should they want to.

I do not think that it is worthy of modifying the discovery order, which I think dovetails into the last motion, which was raised.  This discovery order was entered and signed by a representative from Mr. Rahbar back when he only had one big law partner on his case, and that -- Mr. Schamel signed the discovery order with full knowledge of the scope of discovery, as was laid out not only at the arraignment, but also in the follow-on motion for a speedy time exclusion.  There was no doubt about the size of the discovery and the scope of the discovery at the time that we did this.

I believe that the trial date, which has now been moved to April, which is, you know, several months after when they first received discovery, moots any argument that they have as to their ability to prosecute this case.

They have extraordinary resources at their disposal, and they should be able to prosecute and investigate this case in a way that every other defendant does.

What it seems to be is that Mr. Rahbar is asking for special treatment here and asking to deviate from a practice that he not only agreed to, but a practice that is something that every defendant that passes into this Court has.

And I think that it is notable that, of all of the motions that Macaulay joins, he does not join this motion to modify the discovery order, and I think that's for good reason, because I

think it is meritless, candidly.

The last point that I will make -- and if you are inclined to decline the discovery motions, I do not think that it's worth bringing up, because I don't know if I want to embroil you in a discovery dispute. But, to the extent that you are interested or considering granting this motion, there are, I think, at least two points of clarification, things that have been misstated repeatedly in Mr. Rahbar's papers that would warrant clarification.

THE COURT: Well, I think, if you are saying that there has been some type of misstatement, you should clear that up.

MR. HOOD: Absolutely, Your Honor.

So there's two. The first, at several points -- so this is at ECF Number 47, 49, 50, 78, and 81. Mr. Rahbar claims that 195,000 documents have been provided by the United States. That's not correct. There have been four total document productions. The first document production is just over 6,000 documents, which includes Rule 16 materials.

Production 2 is an unfiltered search warrant, which is 72,000 documents. But, in reality, it's only 14,661 unique e-mails.

Production 3, which was the D-order results -- and by way of background, I know you know this, Your Honor, but a D-order is essentially the header -- the content list headers of e-mails.

It is usually produced, as our office practice, as one

file.  As a courtesy, I unzipped that zip file and provide all of them.  That's 81,417 contentless e-mails.  I don't think I am breaking any news when I say that none of those will be part of our case-in-chief.

And then lastly, Production 4 was 258 documents.  So all in, it is just under 160,000 documents, which is 35,000 documents less than they claim.  But when you actually look at the substantive e-mails or substantive documents, it is just about 22,000 documents, which is about a tenth of what they claim.

Even if you look at the page count, according to my database, we only have 130,000 pages in our discovery.  And so again, I'm not exactly sure where this 195,000 figure comes from, but it certainly didn't come from the government.

And then the second thing, Your Honor, is, throughout their pleadings they suggest that the United States has represented that we do not believe that documents within the FBI's possession, custody, and control are within our custody and control.  That's absolutely not true.

Based on that e-mail or based on that representation, I went back and searched my e-mail to see where that happens.  And I came across one e-mail in which the phrase "possession, custody, and control" comes up.

And in this e-mail exchange, which is about a specific document which we have already turned over, the background is that this document had some formatting errors, and that is how it

was received from the FBI.  I provided that document to Mr. Rahbar's counsel.  They say, Can you please fix the formatting errors.  I say that there is no reformatted report that exists.  Like, this is the only version of this report that exists, so there is no other version that's in my custody and control to turn over to you.

But when the FBI agent/analyst comes back into town and she reformats the report, I will send it to you because then the report will exist, and it will be in our possession, custody, and control.

I gather from this exchange that they have extrapolated that I am making some assertion that the FBI's files are not my files.  And to the extent that that is relevant to the Court's decision, that's absolutely not the position that I hold, the U.S. Attorney's Office holds, and I do not believe that's anything that I said, either in writing or orally.

THE COURT:  It's always something.

MR. FLOOD:  Just a brief response, Your Honor.  When I was talking about no prejudice, he did not articulate any of what he just said in terms of how prejudicial this would be to the government in his paper.

THE COURT:  It is prejudicial.  It is prejudicial, if I'm trying to prepare my case and I have to stop preparing my case to prepare something for you.  That is prejudicial.  It is.

MR. FLOOD:  Well, he knows what 801(d)(2) admission

statements he's going to introduce.  He knows what 404(b) evidence he's going to seek to introduce, and we're entitled to prepare.  Given that, a few days before the date for trial is not sufficient time, so we're asking for additional time.

As it relates to the misstatements that they're representing, Ms. Ullery will address -- because she was involved in counting them; so I wasn't involved, I relied upon her -- but as it relates to this e-mail, I do have the two reports, and the defective report he did provide at my request, and half of the data is cut off.  And I sent him an e-mail requesting that he provide the complete report.

I would like to submit both the defective report and the complete report so the Court can understand why I was making this inquiry, as well as the e-mail exchange.

THE COURT:  Is it the same e-mail exchange that you just read?

MR. FLOOD:  Yes, yes.

THE COURT:  Okay.  You can hand it up.

MR. FLOOD:  What I would like to read into the record is what he responded to, was my request for the complete report.  And the pertinent language is, "As for the FOA report, we produced it exactly as we received it.  No other version of that report exists, so I do not have a reformatted version within my possession, custody, or control.  Though the report's formatting makes it difficult to review the charts -- I don't agree with

that -- you have access to the text of the report, the spreadsheet that forms the basis of the text, and the underlying bank statements which form the basis for the spreadsheet.  I believe this more than complies with our obligations under Rule 16."

MR. HOOD:  Could you --

MR. FLOOD:  And I --

MR. HOOD:  -- Could you finish reading the e-mail?

MR. FLOOD:  When I --

THE COURT:  Hold on.  I don't want that.  And I'll warn all of you.  I will lose patience, because lawyer's come in this courtroom a lot, and they are really laser focused on their case, and I understand your case is very important to you, but I've got 300, and I have very little tolerance for this, okay?

MR. FLOOD:  Thank you, Your Honor.

THE COURT:  I have a trial next week, and this is just one of many things that I have on my plate, so I don't want the back and forth.

MR. HOOD:  I apologize, Your Honor.

THE COURT:  Anything else?

MR. FLOOD:  Just to finish, in our first *Brady* motion, we had asked for that report with an oral request, after meeting with him.  He said he would provide it.  It was defective.  I asked for the complete report, and that's the e-mail exchange that ensued.

Because, until today, he hasn't accepted our view of what his obligations were, I erred on the side of expressing that, and footnote 2, which is what I think he's referring to, cites *Kyles* regarding the government's obligation.  That's what this dispute is about, and it is in his custody and control as long as it's in [sic], as the Court has put it, an investigative partner, and that's what we're asking for in these motions.  Thank you.

THE COURT:  Thank you.  And I think he understands that, at least that is what he has indicated this morning.  Is that true?  I only need a yes or no.

MR. HOOD:  That's correct, Your Honor.

THE COURT:  Thank you.

MR. HOOD:  And I don't know if it was included.  I didn't get a chance to see his version of the e-mail, but I believe he does have a copy of the report that is the --

THE COURT REPORTER:  I'm sorry?

THE COURT:  He passed up that copy.

MR. HOOD:  Okay.

THE COURT:  So, with respect to Docket Number 53, the motion for disclosure for specific evidence, I'm going to deny that at this time.

I've already entered an order in this case that has been very clear about the obligations of the government with respect to *Brady*.  It includes what's in their files.  It includes what's in their investigative agencies' files, and I have directed

Mr. Hood to affirmatively send something in writing to the investigative agency here reminding them of their obligation to comply and getting an affirmation back from them that they understand that and that they have complied and will continue to do so if other *Brady* information comes within their possession. Okay?

With respect to government -- I mean Docket Number 54, which was the motion for disclosure of favorable evidence against witnesses not called to the stand by the government, the government does not have a duty to proactively go out and gather impeaching evidence of nontestifying declarants.

It is different if that evidence is -- if they have impeachment evidence within their possession.  Their possession includes the possession of the investigative agencies.  If they have that, they have an obligation to disclose it.

So I'm denying your motion with respect to that, because how I read your motion is -- you've asked for the government to turn over impeaching evidence of individuals who are not being called to testify at trial but whose statements are being introduced at trial, and you don't distinguish in your motion between what they have or just what is out there generally.

What they have in their files, they are required to give over to you; what they do not, they are not required to go out and gather.

I'm going to -- because right now, what's the deadline for

404(b)?

MR. FLOOD:  Fifteen business days.

MR. HOOD:  That's not correct.

THE COURT REPORTER:  I'm sorry.

MR. HOOD:  I apologize.  The discovery order says that 404(b) evidence is to be disclosed no later than ten business days before trial.

THE COURT:  Okay.  Well, I'm going to give them 15.  I'm going to amend that order and give them 15 days.  I'm not giving you 30.  I am not receptive to complaints from this particular defense team about resources, okay?  Because I'm looking at a table over there of one.  I know he has a second attorney that will be joining him in a while.  I know he has investigative agencies.  But there are a lot of resources here.

Even if there weren't those resources, though, the government is -- and I'm turning to your motion for the Rule 802 -- Rule 801 statements, I believe it should be.

The government is not obligated.  If you have those in your possession, you have them.  They're not obligated to go out and make some sort of roadmap for you at this stage of what they're going to be using.  You have the statements.  You have Mr. Rahbar.  He has more knowledge of these statements than the government does.

And it would be prejudicial for them to have to go through and be preparing for trial at the same time as preparing for --

or identifying statements for you all.  And because we also know that sometimes your strategies, your decisions may change the closer you get to trial.  Then that would be the complaint.  The fact -- "Well, that wasn't on the list when you told me 30 days ago."  Thirty days -- I mean, that's not their obligation, and there's not -- you don't have a case in this Fourth Circuit, I know, that will tell you that that is the obligation of the government.  So I'm denying that request.

I will, though, give you the extra days, but I think, under these circumstances, I think 15 days is sufficient with respect to the 404(b).

MR. HOOD:  Just to clarify, Your Honor, is that 15 business days or calendar days?

THE COURT:  I was going to say calendar.

MR. HOOD:  The discovery order says 10 business days currently, which would be about 14 total days

THE COURT:  Oh.  That does seem like enough.  I was thinking in my mind that it was calendar days.

THE COURT:  You know what?  I am going to give them a little bit of extra time with respect to 404(b), because there's going to be a motion based on the 404(b), and I need time to address it before trial.  So I will give them the 15 business days for 404(b).  If you're going to file a motion with respect to 404(b), you have a week to do it.  So get those associates ready, okay?  That way you will have time so we can have -- they

can respond to your motion to exclude it or to challenge it, and I can set a hearing date prior to trial, okay?

MR. FLOOD:  Thank you, Your Honor.

THE COURT:  All right.  Let's see here.  I think those are the discovery motions.  Let's -- Mr. -- I'm so sorry.

Mr. Barbari, let me hear from you on your motion with regard to these -- did you want to make an argument with respect to these conspiracy statements?  Because I know you see the writing on the wall with that.

MR. BARBARI:  Thank you, Your Honor.  And I do. Understanding the Court's ruling on 801(d), I think we'll just rest on the papers at this time.  I don't have anything really additional, other than what's in our motion.

THE COURT:  I think in this court it is routine for us to admit those statements conditionally and then have the conspiracy established.

MR. BARBARI:  I understand the Court's ruling, Your Honor. I think our position still remains that we would request that hearing to determine that because of the highly prejudicial nature of what those statements could be being said in an actual trial in front of a jury, but I understand the Court's ruling.

THE COURT:  Okay.

MR. HOOD:  The United States would also rest on our papers as it relates to --

THE COURT:  Well, I just denied that motion, if it wasn't

clear, okay?  And so, to be clear, those statements would just be conditionally admitted before the conspiracy has been independently established, as long as later the evidence is, you know, later establishes the conspiracy.

That takes us to the -- let's take up the Bill of Particulars.

MR. STOKES:  Okay, Your Honor.  I thought, before I jumped into this, it's somewhat linked to the discovery issue.  I would just sort of clarify something Mr. Hood said about the documents.

THE COURT:  Okay.

MR. FLOOD:  Just so the Court knows, first, discovery disputes are nobody's cup of tea, particularly for former prosecutors, and so we certainly don't mean to burden the Court with, you know,  disputes of this nature.

Mr. Hood expressed dismay at the number, 195,000 in our motions.  It's dismaying to us why he would express dismay with that number.

We certainly tried to talk him through that the other day. The fact is we have 195 distinct documents in our database produced by the government.  You can slice and dice data how you want to come to 22,000.  It really doesn't matter for purposes of today.  I recognize that.  22,000 is a lot of documents; 195,000 is a lot of documents.  There are 56,000 e-mails.  There are 7,000 documents that they selected that they think are hot documents.  So it's a lot of details.  And so it really, again,

doesn't much matter whether it's 195 or 22.  The suggestion that that was somehow or another a misrepresentation by us, I think, is offensive and is surprising to me that he would make.

But, regardless, we don't need to solve that issue here. We've been discussing with him the various discovery issues in the case.  The Bill of Particulars.

Your Honor, we've tried to be narrow and selective in what we're bringing forward in these motions.  And so, in the Bill of Particulars -- you know, Bill of Particulars are typically unnecessary and often resolved just by discussions between counsel, and, unfortunately, that doesn't work -- hasn't worked in this case.  We're happy to proceed with Mr. Hood and simply have informal dialogues to resolve many of these types of issues.

And we're hoping, going forward, as we prepare for trial, that we'll be able to have those sorts of discussions, because, you know, frankly that just makes everybody's life -- certainly burdens the court a whole lot less, and that's certainly one of our goals.

This Bill of Particulars, we turned it into a technical legal argument.  What it boils down to is, the government has obtained a 14-count indictment, 20 pages.  There's a fair amount of detail in there.  We're not disputing that, and they've provided a mountain of discovery in the case, whether it's 22,000, 195,000, whatever the number is.  It's a lot of documents.  And so the issue that we focused in on is really

of -- I'm getting in to a little bit more detail, and I'll try to be concrete here -- it's really just, the government in its indictment has identified that certainly and obviously they're fraudulent -- it is alleged that they're fraudulent representations in connection with  loan applications, as well as unauthorized expenditures of the loan funds.

It's provided some scant detail in the indictment itself. It's provided in discovery, again, a lot of discovery, spreadsheets, bank records, and other things.  What it hasn't done is -- it's alleged that the -- that the fraud here is that Mr. Rahbar and Mr. Macaulay, the defendants, have provided -- have engaged in legitimate, as well as bogus, as well as made legitimate, as well as bogus representations to the banks to obtain these loans, and they've not distinguished -- the government hasn't distinguished between what is legitimate and what is bogus.

In terms of use of funds, it's identified that there's legitimate authorized use of funds and unauthorized use of funds.

We're left with going to trial having no idea or limited idea what is legitimate, what is not.  So, we're not disputing that the indictment, the discovery, and meetings with Mr. Hood have in fact -- he has shared some information that tells us the theory.  We're not interested in the government's theory.  That's clear from the indictment.  We're not trying to get them to do our work for us.  What we're trying to do is go into trial in

front of a jury understanding what the crime is.  And that, we think we're Constitutionally entitled to, and that crime is more than just sort of a high-level description about what exactly you are saying is false.

THE COURT:  So, isn't what they're saying is false is that these loan applications were submitted and they lied about the number of employees that were working for the various entities, and they submitted fraudulent records in support of that?

MR. STOKES:  Yeah.  So exactly.  So we've identified five categories in our motion, and I can just --

THE COURT:  Okay.

MR. STOKES:  -- directly address the Court's question on this.  So, for example, on that first one, employees and payroll, they said in the indictment that Mr. Rahbar, Mr. Macaulay have inflated employee counts and thereby inflated payroll.

The word "inflated" suggests that some amount is legit, some amount is bogus.  There are spreadsheets.  There are documents.  There are payments.  Mr. Hood, the government, hasn't identified -- out of those 54 employees, for example, with one of the loan applications, which employees or how many employees are legitimate -- there was, after all a business -- and what are illegitimate.

And so going to trial, we are at risk of trial by surprise not knowing if Mr. Hood is going to offer evidence of two employees, six employees, 50 employees, 54 employees being bogus.

And that's difficult to prepare for.  That's trial by surprise, from our perspective.

THE COURT:  But did they not -- and I'm just trying to make sure that I understand, but I thought they handed over in discovery the interviews of the individuals, like the alleged employees, and, you know -- so would that not reflect who is a legitimate employee from who is not?

MR. STOKES:  From our perspective, no, for this reason: And I certainly don't mean to represent that I have sort of a perfect recollection of every interview memorandum, but, as a general matter, some of those interview memoranda are with individuals who say, Yes, I performed services, and I got money. I don't -- and in some instances they say they did nothing, and in some other instances they say they did work, and they got money, and the question is how much.

So, we don't know whether the government is suggesting that an individual that received funds and purports to have done some amount of work is a legitimate or an illegitimate employee.

And, again, this is easily solved.  This isn't something, you know, that's a trap, right?  This is what prosecutors and defense lawyers talk about all the time in preparation for cases. And indictments often identify with specificity what is bogus and what is real.

And so, yes, we have some interview memoranda.  We don't know whether that covers the entirety of the government's case.

We don't know how it maps to the government's case, necessarily. And so we're simply looking for information to understand how many -- you say it's inflated.  By what?  How many employees? Who are these employees?  What are we preparing for?  Who should we try to speak to in our preparations?  Who should we try to prepare for in trial?

The technical/legal protection we're also looking for here, certainly notice and not being surprised at trial, but also certainly double jeopardy.

In theory, Mr. Hood -- I'm not suggesting he would, in fact, do this, but the constitutional risk, of course, is that he could come in and try to prove up two employees are bogus, lose that case, and come back the next week and charge and try to prove two other different employees who are bogus.  So we're looking to understand, what is the crime, where is the crime, what is the falsity?

THE COURT:  If the indictment is not specific enough as to which employees --

MR. FLOOD:  -- or how many --

THE COURT:  -- or how many are bogus or not, how then could they come in and then charge that, if it's only -- if the conspiracy is defined in that way?

MR. STOKES:  Well --

THE COURT:  Because it would capture the employees with respect to that entity or, you know, lying with respect to that

loan application.  I don't see how there is a double jeopardy issue there.  Maybe I'm missing that.

MR. STOKES:  So, we think there is -- that the government could argue that there is, you know, there's falsity in connection with bank representations connected to saying you have 54 employees and prove up at trial, based on the way that the indictment is drafted with the language of inflation, that these two employees are not legitimate -- were not employees, and, therefore, your loan application is inflated by those employees. They could come back at a later time, we believe, and try to argue that different employees are bogus employees.

This goes beyond employee count and payroll count, but different amounts of payroll are bogus.  It also goes to -- they say that they can prove their case through fraudulent documents that were submitted.  They've identified loan apps, spreadsheets, and tax documents, but the indictment says other documents.

We don't know what those other fraudulent representations are.  So they can come into court and use different documents to say this particular document is a representation to the bank and, therefore, is a bank fraud count, and we don't know what those documents would be.  We don't know what the falsity would be. They just alleged it generally.

They've said, for example, unauthorized loan expenditures. So, the Beyond Fit entities, Mr. Rahbar got loan money.  They spent it on -- in the authorized ways.  They've identified very

vaguely that money was not used for payroll.  It doesn't have to be used for payroll.  We'll put that aside.  That's a trial defense.  The government has alleged that the loan funds weren't used for payroll, and much of the money was transferred to them and which they controlled, again, without sufficient specificity.  And so we are not sure what documents he intends to use at trial -- oh, I'm sorry, what falsity or misrepresentations were misauthorized use of funds he intends to use at trial.

So it creates two risks.  One is the notice or unfair surprise risk, constitutional dimensions, due process, and the other is the risk of double jeopardy; that he would come back and charge different representations as different crimes.

As the Court is well aware, bank fraud, wire fraud, you could list out every representation as a distinct crime with a distinct count, and he would be able to come back at a later time and charge --

THE COURT:  But here, how they have charged this in the indictment, and I'm looking at Counts 2 through 6, it's submitting a fraudulent PPP loan application.

So I would think that that would cover any kind of representation with respect to that particular loan application.

MR. FLOOD:  It --

THE COURT:  Even if -- whether or not it's employees, whether or not it's inflated.  It's whatever they did with the payroll.  But the way that that is stated there so broadly, in

terms of its a fraudulent PPP loan application, it captures anything fraudulent with respect to that loan application.  Is that how you read it?

MR. STOKES:  So, Judge, we hope we're not back in front of you on a double jeopardy motion.

THE COURT:  Well, you should hope you are, because I'm reading it your way.

MR. STOKES:  And if we are, we think we're going to win that motion, but we're trying to protect against this.  The real issue that we're trying to protect against, Judge, is unfair surprise.

What that translates to is -- something that's easily solvable here is the prosecutor sits down and says, here's what I'm saying is false, so we walk into the courtroom on the day of trial and we with know what it is we're fighting over and whether or not that's a crime or not.  It shouldn't be that we're coming into court on the day of trial and we're fighting over, what's the case about?

THE COURT:  I think you'll be doing that regardless.  I think you know what this case is about.

MR. STOKES:  We know generally what it's about, but we have to prepare for witnesses and documents with specificity.  So we're asking -- for example, unauthorized use, there's millions of dollars that were -- in loans -- that were obtained and the moneys were spent in numerous different ways.  Monies went to

Mr. Rahbar.  He's entitled to funds.  So, presumably, the argument is he got too much money.  Monies went to -- for rent.  Monies went for operational expenses.  The government hasn't identified what is bogus and what is not.

We think it's fair and routine in a fraud case for the government to identify what is fraud, what is legit, and that's all we're asking for here.

We're not asking for the government's theory.  Their theory is obvious.  We know what the government's theory is.  We're not asking them to do our work.  We're asking the government to tell us, what is the falsity you're trying to prove with specificity so we know what we're defending against.  Otherwise, it's a moving target, and we're left guessing, to some degree, and we think this can be easily remedied through a Bill of Particulars or, frankly, just in order for Mr. Hood to sit down and walk through this with us.

I will say in fairness to Mr. Hood, and I don't want to suggest -- Mr. Hood did sit down with us.  I believe he also sat down with prior counsel.  He sat down with us.  It was early November.  We spent about an hour with him.  Ms. Starr was also there.  He walked through a PowerPoint presentation.

Again, he sort of addressed the issues in the way they're in the indictment.  It identified specific documents.  It identified -- this is, again, the theory, how we're going to prove our case.

THE COURT:  They did that?

MR. STOKES:  He did.  But what it doesn't do, and this is why we're trying to be very precise with our motion here, is it doesn't tell us -- we get a loan application, you're saying, you're alleging that the loan application --

THE COURT:  How many -- I'm sorry.  How many loan applications, though?  Because it's a finite number of loan applications that are at issue, are there not?

MR. STOKES:  Yes.  There are ten loan applications, and what we're talking about is employees and payrolls.  So each loan application has a certain, you know -- for example, Beyond Fit Chinatown entity, the first loan lists 54 employees, and so it's -- the indictment is that that number is inflated.  Each of the allegations is that that employee amount is inflated.

And so what that means for us, just to translate it into the concrete, is that we need to figure out is it -- did he have -- did Beyond Fit Chinatown have three employees?  Did it have 25?  Did it have 50?  What is the number?  What are we trying to defend against here from the government's perspective?

It sounds like an eminently answerable question because Mr. Hood and Ms. Starr investigated the case for with the FBI.  They sought and obtained an indictment.  They must know the answer to that.  And so we're trying to figure out, rather than like in the *Balanovski* case out of the Second Circuit where the government charged 12 fraudulent insurance submissions related to

false burglary claims, and the government wasn't, in fact, trying to prove that all 12 were false, but only 4 were false, and the defense had to go to trial and had to guess which were the four that were false.

THE COURT:  But here, don't you know it's all 10?

MR. STOKES:  I'm sorry?

THE COURT:  But here, don't you know it's all 10?  Because I saw that case, and --

MR. STOKES:  No, no.  It's not the loan applications, it's what is false isn't the fact of the loan application, because what's alleged as false is how many employees.  They inflated the number of employees and they inflated -- and so, for each of those applications, the issue is magnified.

So for application one for the first loan for Beyond Fit Chinatown, the allegation is that Mr. Rahbar inflated the number of employees, which are 54.  So, does that mean 20 are legit and --

THE COURT:  But in the *Balanovski* case, they were indicted for the fraud based on the false burglary loss claims, but the government didn't provide the dates of the alleged staged burglaries and which documents were actually falsified.

At least here they have identified what -- which documents.  So that, I see, as somewhat distinguishable, because there, when you have ten -- you don't even know what's what.  You don't -- if you don't even know which burglaries, you can't

possibly identify which documents.  Here, it's a finite set of documents.  I understand your argument, though, because what you're saying is that, even though we know the 10, because of the number of employees that are involved, we don't know which employees they are focused on.  We don't know how much is inflated, because we don't know the exact number or which -- or other specifics.

MR. STOKES:  Yeah.

THE COURT:  And you're alleging that with respect to each of the 10.

MR. STOKES:  Yeah.  For example, Your Honor, it would be one thing if the government charged, this is a fake business and it had no employees.  Then we may agree or disagree on that, but we would then know what we're actually investigating and defending against.  Here it's, this is a loan application for a business where the employee and payroll accounting is inflated, and, apparently, from the Government's perspective, at least with Beyond Fit Chinatown and the ones they've identified in the indictment, are real business -- there was a real business, there was some level of operations; it's just that the the defendants overstated what the business was.

And my point is, okay, they overstated it, and what is that overstatement?  And knowing that it's a loan application doesn't get us very far.  Well, it's, you overstated it.  Well, by how much?  And we understand that facts change, evidence

changes at trial.  We're not asking and I'm saying on the record that -- we're not intending to say to Mr. Hood or to the Court that Mr. Hood told us that there were 20 fake employees and, in fact, he's trying to prove 22.

What we're looking for is some guidance and direction so we know what is this case about so we understand how to prepare so we're not going into trial surprised by this.

Again, this is -- from our perspective, these sorts of issues don't get in front of courts for good reasons because they're easily worked out amongst counsel.  We would like to work this out, but we're here before you, like many of these discovery issues.  We're here before you trying to get Court intervention to help us work this out.

We think, frankly, it will make -- if there's going to be a trial -- there will be a more efficient trial, a more effective trifle.  In -- you know, the way things are set up, the defense deserves a fair trial.  It allows counsel to prepare in a way that we can prepare in fairness for Mr. Rahbar to defend against charges that, at this point, are -- I don't want to overstate it.  They're not hopelessly vague.  It's nothing like that.  That's not the issue here.  It's that it's identifying sort of a degree of falsity or a degree of fraud without telling us what that degree is.  And we're left to wonder, who are the legitimate and illegitimate employees?  What are the authorized uses and unauthorized uses?

THE COURT: But don't you inherently know who are legitimate and the illegitimate employees are?

MR. STOKES: No. We don't know what the government thinks. We don't know what the government intends to put in front of the jury and prove? We don't know at this point who the government's witnesses are, so we don't know what the government knows, and these mysteries could be dispelled pretty easily. So that's why we're making the ask.

THE COURT: Mr. Hood.

MR. HOOD: Very briefly, Your Honor. Two things: So, I agree that this is not a particularly -- let me start over. Our key position is that we have provided all of the documents in discovery. We have given, I guess, what you would call two reverse proffers, and it had -- it also identified the --

THE COURT: What did you cover in the reverse proffers?

MR. HOOD: I'm sorry?

THE COURT: What did you cover in the reverse proffers?

MR. HOOD: We covered, essentially, the indictment. So we walked through some of the charges, and we gave illustrative examples of some of the counts.

Like, we identified, I think, some of the employees. I think -- I don't have the reverse proffer in front of me, and I apologize for that, but I believe we identified or we put excerpts of certain interviews of -- and identified some of the employees who we contend did not actually do work for Beyond Fit.

I believe that, through the formal and informal discovery, we have complied with what is required by Rule 7, and I think an example -- there are a few things in the indictment that I think provide some of the details that he's looking for.  For instance, the money laundering counts also explicitly enumerate which transactions -- or at least some of the transactions that we believe to be illegitimate.  So they have a sense of what they need to defend against, at least these four or five transactions that we've identified.

Moreover, in the forensic accounting report that we provided and the spreadsheet of that report, it actually lists every single transaction on every single Beyond Fit account.  So they have the ability to go through and see, this went to payroll; this did not go to payroll.

So they have the ability to find that information.  And if the Court orders me to do that, I will -- that's what I will do. I would go to that spreadsheet and then I would pick or I would basically filter the spreadsheet and --

THE COURT:  Do they have the spreadsheet?

MR. HOOD:  They do, Your Honor.  So --

THE COURT:  What about with respect to the employees?

MR. HOOD:  So, certainly I think you've hit on a few things in speaking with counsel for Mr. Rahbar that they have in these applications -- they were submitted to the bank, a list of all of the people they claimed to be employees.  And what we, the

government, did was interview as many of these people as we could find and see whether or not they actually worked for Beyond Fit, and then compared that with other records to see if that was --

THE COURT:  Go back and say that again.

MR. HOOD:  I'm sorry, Your Honor.  So, in these PPP applications, in order to get money from these lenders, you have to submit what your payroll -- what you claim your payroll expenses are.  And so what Beyond Fit did in many of these instances was provide a spreadsheet, and the spreadsheet had 5 employees, 10 employees, 50 employees, and it said, these are the employees that worked at Beyond Fit, and these were their salaries.

And so what we did, the government, was take that spreadsheet and try to find as many as we could.  We interviewed them, and then we provided those interview memos over to the defense.

So, if they're asking us how many of these employees are legitimate or illegitimate, I would just do what I think they're going to do, which is go, compare the interview memos to the spreadsheets.

THE COURT:  But I do think they want some clarification on whether or not you include people who said they did some work but maybe not as much work, whether or not they would be a legitimate employee or not.  Because that's something that they're trying to get a sense of.

MR. HOOD:  And I understand that, Your Honor.  And it is our position -- certainly, if the Court -- I agree with Mr. Stokes' overarching position that this is not a big deal.

THE COURT:  Well, Lord, I wish you all had worked it out, then.

MR. HOOD:  I actually called them.  We tried to have a phone call a couple of days ago.  We talked about it very briefly.  That phone call didn't ultimately lead to --

THE COURT:  Okay.  Here's the thing.  When it comes to complaining about the various transactions and how the money was spent, I do think the forensic report provides you all -- are you raising your hand?

MR. STOKES:  I was going to make a point about that, Your Honor, because --

THE COURT:  I really want you all to --

MR. STOKES:  -- it's different than what he's representing.

THE COURT:  Please.  What I really want to happen  is for you all to go to discuss this and figure this out.

MR. STOKES:  Sure.

THE COURT:  You know?  Because I think you've seen enough this morning to know that I don't think they have to forecast everything, but I do understand what you're saying in terms of notice and preparation, and you should have a clear indication of, okay, is it your -- because if it's someone who has done some

work, is a legitimate -- you consider an illegitimate employee, they should know that, because it's the difference of how to prepare with respect to those folks.

If someone is saying, I didn't know her, well, that's clear. What else do they have to say about that? That's clear, and you have the interviews of that.

And what he just represented today was he got the list, they went out and interviewed those people, and so you have the people, if you have the interviews. And if that's their universe of who they are saying is -- cannot be legitimate, just based on the people that they have interviewed, that's the universe, right?

MR. STOKES: First, Your Honor, we'd be delighted -- I'm not sure if you're waiting for me to respond.

THE COURT: I only wanted that answer.

MR. STOKES: Okay. That would be the universe.

So, it's very helpful for us to understand that's the universe. I'm not sure that's what Mr. Hood meant, but if that is the universe, then that's information that we --

THE COURT: Is that what meant is the universe? Because you said you've got the list, and those are the people you interviewed, and that's what you you have. And surely you're not going to go on what you don't have.

MR. HOOD: Exactly. So what we did -- and for the Court and for defenses counsel, in the PPP applications that were

submitted, again, there are these spreadsheets that we talked about at length, we just interviewed the people -- as many folks as we could find.  And maybe -- I think that's -- I actually don't think there are any that it's possible -- let me rephrase.  It's certainly possible they identified employees other ways, but my understanding is that is how the people who we believe are employees -- or not employees are identified.

THE COURT:  Okay.  Well, get some assurances on that.

MR. HOOD:  Yes, Your Honor.

THE COURT:  And then make that representation to them.  I'm going to just hold that one -- I'm going to reserve ruling on it in the hopes that you all will come back and let me know.  You can file something and let me know that it's been resolved.

MR. STOKES:  Your Honor, if I can just -- on the forensic accounting report, what I would say is we're delighted to sit down with Mr. Hood, and we can certainly talk through all these issues we have questions about on the forensic accounting report.  It's not actually comprehensive.  It says, by definition, it's select.  It says it in the report.  But the real issue for us is it just simply identifies transactions and doesn't --

THE COURT:  It doesn't say payroll?

MR. STOKES:  No.  It doesn't say -- it doesn't say what is authorized, unauthorized, what the purposes are.  It's just simply a listing of transactions, and it says that the following is an analysis of select activity in the accounts reviewed.  It

does not include all activity or transactions.  So this may be everything they intend to rely on.  We don't know.  But, again, these are the sorts of issues, I think, sitting down and talking about the case we can work through.

And if we have some of reason to come back -- we recognize the Court doesn't want to hear from us again on these sorts of issues.

THE COURT:  I'm glad you --

MR. STOKES:  -- so we'll try to work it out.

MR. HOOD:  I agree.  We can work it out.  Just to clarify on this, and I might have misspoke.  So, the forensic report came with a spreadsheet that included all of the transactions, and so I consider the forensic accounting report to be two files, the actual written report, which is a summary, and the big giant spreadsheet which includes everything.

So, the to the extent that I -- and the big, giant spreadsheet will include all of those transactions.

THE COURT:  And that one will identify what's payroll and what's -- I'm going to let you -- I don't need to hear anything else about that.  I'm going to let you all talk and work that out, and we're going to move on to that motion to dismiss.

MR. STOKES:  Thank you.

MR. HOOD:  Your Honor, one thing, just to clarify.  I believe when we were sort of talking earlier, I got a little heated, and it was certainly not any intention to accuse them of

doing anything untoward, and I apologize to Mr. Flood.  I cut you off, and I didn't mean to do that.  But, you know, whether or not the number is 195 or 20,000, I think we're all on the same page here, and I certainly did not intend to offend defense counsel or to present discovery issues to you, which is --

THE COURT:  Okay.  Thank you.

MS. ULLERY:  Your Honor, if you have any particular places you would like me to start, I'm happy to.

THE COURT:  You just start wherever you want to, and if I have some questions, I'll just jump in.

MS. ULLERY:  Please do.  This motion to dismiss is very targeted.  It specifically addresses Count 13 of a 14-count superseding indictment.

The government has charged Mr. Rahbar in Count 13 with aggravated identity theft for putting his business partner's name on a loan application for an entity that both business partners helped found and run, and that's something the government does not dispute.  The purported victim here of the identity theft is Mr. Pierre, and he's somebody that the government has charged as and has pled guilty to being a co-conspirator in this alleged fraud.

This is just very different, a far cry from the traditional identity theft scenario where the defendant steals the identity of an unsuspecting party and uses it to get a service or benefit he would not otherwise be entitled to receive.

These men were business partners and, according to the government, co-conspirators.

THE COURT:  And I agree with you with what you're saying, but even people who are complicit in some activities sometimes, when you are stealing their identity, it can still be problematic like in the *Jones* case.

MS. ULLERY:  Sure, Your Honor.  And the *Jones* case is, of course, not a PPP fraud case specifically.  That was, we think, distinguishable because it involved a more traditional, straightforward identity theft situation.  That was the passport case where the brother is stealing his brother's -- the other brother's passport -- or information to apply for something that he could not otherwise get.

The brother had no idea, and then he received something he would not have otherwise been entitled to.  Here, we have business partners applying for a loan for not themselves individually, as the government's response suggests, but the business itself, and --

THE COURT:  This is the BF Georgetown?

MS. ULLERY:  Correct.  And whether one business partner or the other business partner signed the application on behalf of that entity is not at the crux of the fraud, and I want to just emphasize that *Coast Lakewood* [ph] is what's been distinguished in the *Dubin* case that the Supreme Court came out with recently.  It's not enough for it to be, you know causal or --

THE COURT:  This doesn't implicate the who, because the who is really the -- it's your position it wouldn't be the entity.

MS. ULLERY:  Yes, Your Honor, and that's our position.

THE COURT:  Understood.

MS. ULLERY:  And just to sort of round that out, I think the Court in *U.S. v. Noble* framed it really well.

THE COURT REPORTER:  I'm sorry.  Say it again.  U.S. v.

MS. ULLERY:  *U.S. v. Noble*.

THE COURT:  He's very strict.

MS. ULLERY:  I appreciate it.  It's a good reminder.  It's my first time.  So thank you.  It's not enough for the identity fraud to matter, it has to matter a great deal to the underlying charge, and the business partner that signs for the entity here does not matter a great deal.

Your Honor, if you had additional questions about the *Jones* case, I'm happy to go back to that.

THE COURT:  No, I do not.

MS. ULLERY:  Okay.  Otherwise, I want to clarify another thing.  The superseding indictment itself does not put which business partner signed at the crux of the fraud.  And that is notably what we have to look to here, right?  There's only one specific mention of this at all in the superseding indictment in paragraph 28, and that says, quote, "The defendants also tried to disguise their ownership of Beyond Fit entities in order to avoid

raising the suspicions of the PPP lenders."  This is a generic statement.  It's not tied to any specific entity whatsoever, and it falls far short of saying that BF Georgetown would not have received the loan if Mr. Rahbar had signed and submitted it himself..  and that would be the crux of the fraud.

So, based on the text in the superseding indictment, there's just not enough there to prove that this is at the crux.

THE COURT:  Thank you.  Mr. Hood.

MR. HOOD:  Thank you, Your Honor.  Four points.  So, first, and as I think you noted, just because someone is a co-conspirator does not mean that they can't be a victim.  It is our position here that Mr. Pierre participated in the overall conspiracy, but was totally unaware of the fact that his identity was being used to apply for that loan.

THE COURT:  Okay.  But it really doesn't matter whether they know or whether they don't know.  Because it's about -- when you look at *Dubin* and we're focused on the crux of what makes the underlying offense criminal, and whether or not it was Mr. Pierre's name that went on there and his e-mail address or whatever information or someone else's who was a part of that entity, it wouldn't seem to me to implicate the who.

MR. HOOD:  Okay.  So I respectfully disagree.

THE COURT:  I'm sure you do, and you said that in your pleadings, but when I look, the indictment doesn't really track the argument that you are making now in your opposition.

In your opposition you're talking about the superseding indictment indicates that they disguised the identity of who was involved in the -- disguised in, I think, the ownership.

MR. HOOD:  That's correct, Your Honor.

THE COURT:  But these Beyond Fit -- in paragraph 7 you say that the Beyond Fit entities were controlled by Rahbar, Macaulay, and Pierre, but when you look at how the superseding indictment reads, it's not about disguising the ownership of those three, it's about this Individual One who was -- I see identified in paragraphs 11 and 12.

For these, you know, they identify this ANC building as being nominally owned by an individual identified as Individual Number 1.  You do that in that paragraph and the next paragraph. So the superseding indictment talks about the disguise of the ownership with respect to this.

MR. HOOD:  So -- it does for those entities, but I believe there are other instances where we talk about why the ownership matters.  As another example, in paragraph 32 --

THE COURT:  Let me get there.  Go ahead.

MR. HOOD:  In paragraph 32 of the superseding indictment, we talked -- one of the false representations here is that a person identified as A.M. was the majority owner of Beyond Fit, and I think that it is helpful to understand sort of what we think actually happened here.

THE COURT:  Well, what does that have to do with

paragraph -- or Count number 13?

MR. HOOD:  It is -- Your Honor, it is an example of why the ownership is material, and that is our contention, is that the ownership of who controlled of entity was material -- a material misrepresentation to the bank.

And then in our footnote in our response, we note -- we proffer some evidence as to why that's important.

What happened is that Beyond Fit entities, two separate Beyond Fit entities, applied on basically consecutive days to get --

THE COURT:  I understands what you're saying, okay, but when I look to 7, which also speaks to BF Chinatown, what you argue is that these --

MR. HOOD:  Beyond Fit is, I believe, how they --

THE COURT:  Oh.  It's Beyond Fit.  Okay.  Beyond Fit are controlled by Rahbar, Macaulay and Pierre.  So it's still those three.  That is not disguise -- I mean, well, it is, perhaps, but not with respect to those three individuals.  It is when this outside person, A.M. that you mention here, it's Individual Number 1 --

MR. HOOD:  It is for A.M., it is for Individual Number 1, but I think that it is material to the bank whether or not it was the -- the entity was controlled by Rahbar, Macaulay, or Pierre, and it is specifically our contention that the reason why he used Carl Pierre's e-mail address as opposed to his own, was to

prevent City First Bank from learning that he had submitted two virtually identical applications to them under two different banks -- under the names of two different entities.

And so by using this e-mail address -- and I think one of the points that Ms. Ullery raised was that it didn't a matter who submitted this application, whether it was Mr. Rahbar or Mr. Pierre, and I think that is not what the indictment alleges.

In fact, I believe what the indictment is saying is that the reason -- that if he had applied in his own name, it would have been rejected because they would have seen Mr. Rahbar had applied yesterday for another entity using the same --

THE COURT:  But that's not alleged here, though.  I don't see that in the superseding indictment.  I don't see -- even with the paragraph that you pointed out, I don't see what you are alleging here now.

MR. HOOD:  So that is a factual proffer that I included in our response in order to give some context to this debate.  But what is alleged in the indictment is that they disguised the ownership of the entities, and that that disguise actually was material to the bank's lending decision.

And it is our position that that is enough to meet the threshold here.  To the extent that there is concern as to whether or not that is actually a cognizable claim, I believe that, because materiality is a question for the jury, the proper way to challenge this specific -- to raise this specific argument

is at a Rule 29 after the evidence has come in.  I don't believe that --

THE COURT:  But I think -- but, you know what, I don't know if this is just materiality, what they are saying.  It's about would this -- would the use of the -- what using that name, how it actually impacts who would have received those services, right?

When you're talking about -- not the how or the when, but the who.  And I don't think them using Mr. Pierre's name as opposed to -- at least it's not alleged clearly here in your superseding indictment.

MR. HOOD:  And I see where this is going, and so I'll sit down shortly, but I think it might be helpful to reorient ourselves to the actual language in *Dubin*.  And in *Dubin*, the Supreme Court said that the interpretation is useful -- or excuse me.

THE COURT:  What page are you on, so I have it here?

MR. HOOD:  123.  So that's 599 U.S. 110 -- or 123.  And they talk about how using the means of identification itself to defraud and deceive.  And then that is what I believe Mr. Rahbar did.  He used the means of identification, Mr. Pierre's name, e-mail address, to defraud and to deceive City First Bank.

THE COURT:  It says, "the means of identification specifically is a key element in the criminality --

MR. HOOD:  It does say that, Your Honor, and we certainly

contend -- or we do not dispute that one of the fraudulent misrepresentations, and perhaps even the most critical misrepresentation is the number of employees.  But we do believe that the actual owner who submitted the material is material, and it was used to defraud and deceive.  He lied about who he was.

THE COURT:  Is Mr. -- okay.  Did all of them have ownership in BF Georgetown?

MR. HOOD:  So --

THE COURT:  Who had the ownership here?

MR. HOOD:  This is -- to proffer this evidence, BF Georgetown, as an entity, did not meaningfully exist.  I think it might have existed on paper.  And, in fact, we do believe it did, but it didn't employ any people.

Mr. Pierre is in conversations with us, has indicated that he was what he called, you know, not even a full partner, maybe a -- I think he describes himself as a minority owner.  I think he said he put in about 5 percent of the company, and the remainder of the company was owned by Mr. Rahbar and Mr. Macaulay.

Again, these are facts that I'm proffering to you that are outside of the indictment, certainly.

THE COURT:  Okay.  And so where -- and you say -- I did see that paragraph -- okay.  Paragraph 38 is where it says that -- it represents he was -- Mr. Pierre was the majority owner?

MR. HOOD:  Correct.  And so, for the loan for BF Georgetown for April 14th -- and, you know, this is the first draw application, and the second draw application is the one that is the focus of Count 13, in all fairness.  I believe that's the case.  Yes, Count 13 is the second draw PPP application for BF Georgetown, but the misrepresentations were the same.

We contend that it is a misrepresentation, and that it was inaccurate that Carl Pierre was the majority owner of BF Georgetown.

And we believe that Mr. Rahbar's use of Mr. Pierre's identity was done in a fraudulent and deceptive manner and that he lied about the who, about who was applying on behalf BF Georgetown, and that lie, that use of someone else's identity goes to the heart of the matter.

THE COURT:  I'm not sure if I agree with you on all that. I understand your argument.  Let me hear from you, ma'am.

MS. ULLERY:  Just a few quick points, Your Honor. Mr. Hood keeps using this word "material".  You mentioned it earlier.  That's just not the standard.

The paragraph that he pointed you to, paragraph 38 of the fraudulent loans for BF Georgetown, he read it and then -- I think it's important to read the last statement.  "Because the size of the PPP loan depended on the number of employees, these statements were material".  But who was the owner of this entity and the breakdown of that has nothing to do with the number of

employees.  It's by definition not material, and it's not mentioned here.

This is a lot of additional information that's being proffered outside of the superseding indictment.  None of this detail was included in there.  If it had been, then maybe we'd be having a different conversation, but it's not reflected here.

I also wanted to note that the -- paragraph 32 is -- regarding the A.M. majority owner of BF Chinatown allegation, that's Chinatown.

THE COURT:  Hold on.  Let me find that.

MS. ULLERY:  Oops.  Sorry.  Paragraph 32 that Mr. Hood was discussing earlier is specific to BF Chinatown, and that was not the entity that was applying for the loan here.

I also -- I guess I also just want to note that I'm not intending to suggest that a co-conspirator can't be a victim.  I just think here that it would be odd for Mr. Pierre to plead guilty, as he intends to do, to something that he was not very involved with, as Mr. Hood suggests.  That's all, Your Honor.

THE COURT:  All right.  I'm going to -- I'm going to be clear -- I'm inclined to grant this motion, okay.  I don't know -- the only thing I need to consider a little more is whether or not I should be considering these additional proffers that, to me, are not laid out in this indictment, because it says nothing in the superseding indictment about, you know, who applies, you know, not on whose behalf these services are sought

or these loans are sought, but who applies makes a difference. It doesn't lay that out.  It doesn't -- to me, when I look at it, it doesn't really matter whose name, in looking at this indictment, and how you have alleged how this fraud was perpetrated.  It doesn't matter who of the three would submit something.  I'll take another look.  Like I said, I don't know what this additional -- I don't even know if --

MS. ULLERY:  Your Honor, if I may on behalf of the defendants.

THE COURT:  Yes.

MS. ULLERY:  There are two cased that we cite.  I believe Mr. Hood also cites the case.  *United States v. Thomas* is one of them, and --

THE COURT:  Hold on.  Let me see if I have that on my list here.

MS. ULLERY:  And this is just the standard, Your Honor, it's not fact-specific.

THE COURT:  All right.  Go ahead.

MS. ULLERY:  And as well as *United States versus Brubacher*.  It's -- the allegation in the indictment is taken as true, do they state an offense, and we believe that that means that they are limited to considering only the indictment.

THE COURT:  Okay.  What was that case again?

MS. ULLERY:  *United States v. Brubacher*, and that is the Fourth Circuit from 2023.

THE COURT:  I'm going to take a look at this one, okay, and then I'll issue a written ruling on it.  Let's move on to the motion to suppress.

MS. ULLERY:  That's also me.  Your Honor, did you have any particular questions you would like me to start with here?

THE COURT:  I don't.  I appreciate you asking me, though, you know.  And I -- this is a tougher one for you, I will tell you, because this affidavit does look to be comprehensive.

Now, I would agree with you that there are certain portions that are -- or certain services that may not be discussed at length, but I went back comparing, and they were mentioned.  I don't know if I saw this Google+.  I don't even know what a Google+ is.

MS. ULLERY:  I couldn't tell you, frankly.

THE COURT:  That's not saying much for me.

MS. ULLERY:  But we agree, Your Honor.  That's why we've sort of tried to narrowly target --

THE COURT:  All right.  But when we're talking about -- let me find it.  Let me get the affidavit, because I went through there.  It did seem to touch on most of them, and I know you talk about how it doesn't show the nexus.

But between certain applications, it does.  And as to the others, it talks about how the services are, you know -- it's a package, so to speak, but the use of the various applications can also show attribution, which is one of the items that they are --

evidence -- items of evidence that they're seeking.  So I don't -- and in reading these affidavits and the warrants, the Court's cautioned against being hypertechnical.

MS. ULLERY:  Yes, Your Honor.

THE COURT:  And so, given that, I don't see this deficiencies that you are focussed on.  So walk me through them.

MS. ULLERY:  Sure.  I'd like to just start by saying that we absolutely acknowledge this is very detailed.  It's just that the detail is relegated to one application, and that's the e-mails.  And, notably, the government also raises that user attribution data in its motion as well, but that doesn't appear to be at issue anywhere in the affidavit.

Who was sent these e-mails is not a question.  The language is very clear that the government believes they know who exactly was participating in sending e-mails and making applications.

THE COURT:  Right.  But they do have various conspirators that are at play, and so to be able to show which conspirator at a given time was controlling something is appropriate evidence.

MS. ULLERY:  Well, Your Honor, I guess, for example, location data.  That one in particular, who the conspirators were and who was submitting what has nothing to do with the location in which they were doing that, and the location in which they were doing it is not in issue anywhere in the --

THE COURT:  But location can show attribution, though,

right?

MS. ULLERY:  It can.

THE COURT:  Of the three people, so that's why it is -- it offers some probative evidence here.

MS. ULLERY:  Understand, Your Honor.  We would submit that the fraud that's described here doesn't require them to be in the same place or similar place, and so that is completely irrelevant to the fraud that they've described here, which is a straight PPP loan fraud scheme.

But just to sort of highlight what we think is so generic about these, if you look at -- it's starting around paragraph 84 of the affidavit itself.  Looking at 84 --

THE COURT:  Page.

MS. ULLERY:  I'm sorry, paragraph 84, page 22.  That paragraph through the end could be copied and pasted in its entirety into any search warrant in any affidavit for any crime; not even just for fraud crimes, any crime.  And in order to establish a nexus, there does still have to be some basis, some tailoring to the specific defendant and the specific crime at issue here, and it's just not here.  This is plain language.

THE COURT:  Well, let's be clear.  You know, there's a lot of -- I don't want to say -- but there is some -- certain paragraphs may not change much from affidavit to affidavit when it is -- in terms of something like this when you're describing how Google functions, but it's clear here that they're talking

about e-mail, which is mentioned here, file storage where documents could be filed, web browsers where searches can be conducted.

So these are relevant to this case, and it may be relevant to a lot of other cases, too, whenever there are e-mails that are implicated or Google accounts that are implicated, but that doesn't mean that it is somehow -- does not serve a purpose here.

MS. ULLERY:  Understood, Your Honor.  And I see where you're going with this.  I'll just add, they could be relevant. We have no doubt.  But they aren't relevant to anything that's described in the affidavits.  There still has to be -- they have to be relevant to -- they have to establish a likelihood that evidence will be found in those particular locations based on --

THE COURT:  What about that training and experience of the agent?

MS. ULLERY:  The training experience is similarly just wholesale.  There's nothing tailoring it to even this case, these defendants, and whole conclusory statements like this just do not do enough to satisfy probable cause.  There has to be a description of linking that training and experience to, even minimally, to what is happening in the affidavit, and it's just not there.

THE COURT:  I understand your argument.

Okay.  But even if I agreed with you on it, how do you get beyond the good faith exception?

MS. ULLERY:  Well, Your Honor, we believe that because there's nothing here, that would support the good faith exception not applying.  The agent has to state explicitly the link, right, the nexus.  And if there's no nexus, then there cannot be the good faith exception.  The good faith exception is only a question of degree, not when the nexus is missing entirely.

THE COURT:  Understood.  Thank you.  Mr. Hood.

MR. HOOD:  I'll be very brief, Your Honor.  I would like to start with what I believe is the standard, which I think is all but dispositive here.

The Court, as you know, is not looking at this sort of fresh.  You are -- the task before a district court judge in the context of a motion to suppress is just to figure out if there was a substantial basis for the magistrate to conclude that probable cause existed.  It's not a high standard, which is the -- excuse me, not a high bar,  which are the words from the *Browsky* case.  It requires only a prima facie showing.  And then, of course, courts are supposed to show great deference  to the Magistrate Judge's determination of probable cause.  That's the *Graham* case found in the Fourth Circuit in 2004.

I think that Judge Vaala reviewed this very extensive affidavit and considered it and found probable cause to exist.  And because of that, the FBI agents relied on that in good faith, and we returned the results that we returned here.

I think that, between those two things, that gets us

beyond the standards for a suppression that I think are wholly dispositive on this issue.

As it relates to the specific arguments, I only will make two here. The first is that, as you mentioned, that this is an integrated Google account. I think they can call it one account or whatever their specific language is, and, because of how these Google accounts work, things that are done in one service may show up in another service, which is the language that's included here in the affidavit, and it is why there is -- why the agent and then Judge Vaala concluded that evidence of these crimes could be found throughout all of these services, and that's because they're of the strong connection between the crime and these underlying accounts.

And then the last thing that I'll mention here is just to underscore that the attribution evidence which, again, is critically important. We just would have argued for 20 minutes about who sent an e-mail, which, I think, was evidence of who sent that e-mail here in these accounts.

And so we would contend that it is important, and it can be found throughout all of these services, including in the location history, which was mentioned earlier.

THE COURT: Okay. Thank you.

MS. ULLERY: Just quickly, Your Honor. Talking about the link, we understand that Google accounts are wholesale, but Google is very capable of dividing these into specific

applications.  That's how we received them when we got them from the government.  They're zip files by feature.  And there is just no reason to think that evidence of the e-mail contents would be found in things like YouTube settings, for example, which is one thing that we did receive.

The other thing that I'd like to note about user attribution data specifically is that there's no time limits on this data placed in the search warrant.

Even though we know that PPP loans didn't even exist before March of 2020, and we have an end date for the last application for each of these payments, the affidavit describes the last in time disbursement of that payment as occurring in June of 2021, and yet there is no beginning or end date placed on user attribution data that they requested.

And that seems facially overbroad to us just because there's such a clear time placed on it, both by the nature of the PPP loans themselves and the text of the affidavits.

THE COURT:  Okay.  Thank you.

And so the standard here is clear.  The review of a probable cause determination by the Magistrate Judge is shown great deference in these cases, and here it's required that probable cause -- that there be probable cause, given all the circumstances set forth in the affidavit; that there is a fair probability that contraband or evidence of a crime will be found in a particular place.

So we look to probable cause as to the crime as well as if that probable cause that the evidence will be found.  And it also requires particularity when describing the place to be searched and the items to be seized, and that there needs to be a clear nexus between the crime and the presence of the evidence -- of evidence of the items to be searched.

And so I spent a lot of time looking at this affidavit, and I know you challenge whether or not the affidavit connects these various Google applications with the crime being investigated here, and you also challenge the temporal limitations in two respects, one to the attribution because there is no limitation, and then even as to going -- for the time period being through January of 2022.

The affidavit identifies the criminal offense under investigation.  It gives you all the details about that.  It also specifically identifies which e-mails we're talking about here. When I look at the first issue, which is what it says -- what the affidavit says about the various applications, I do think it's sufficient here, okay, in describing how -- first of all, I start with paragraph 84, which is the one you started with, discussing the variety of online services that Google provides and identifying ones that the affidavit or letter later lists out how they fit the -- provides evidence in this case.

In paragraph 87 it talks about how Google advertises its services as one account, "all of Google working for you," and

that it -- how all of the services work together, and that all of these records that Google maintains across the various platforms or applications can indicate ownership and usage of the Google account across services, and these are paragraphs 84 and then 87.

Then it goes through and identifies -- and you all don't focus or take issue with the specific applications that are discussed here in detail like the Gmail, the calendar, the messaging, but but I think you focus more on maybe the Google hangout, chats, all of these things, but the affidavit lays out how all of these services are interrelated, how all of these services can be used, and the type of information that is reflected in these various applications, and they all have indicia of attribution as well, which is at issue here when you're talking about allegations against multiple actors.

And I know you complain about the paragraph discussing the agent training and experience, and that it seems somewhat -- it's phrased more as a probability, that it could contain certain evidence of a crime, but that's all those paragraphs, this Court thinks, that they can ever say, because they cannot say with any type of certainty that this evidence will be found there, but that it is likely to be found there.

So I think that paragraphs -- starting at paragraph 84 all the way to the end of the affidavit are sufficient to show a nexus between these applications and the crime and the evidence that they are seeking.

As to the timing, I don't think that it was necessary within the four corners of the affidavit to identify the last transaction that could have occurred in January of 2022.

What it says there is this is an example of all of these -- of several of these transactions, and they also continued up until this time, and I think that is sufficient to establish the date range that is reflected in the warrant.

And I don't think that, with respect to attribution, that it is necessary to provide a temporal limit. I don't think the Fourth Circuit requires that.

And so I do think that the affidavit established the appropriate nexus here, okay. So I'm denying the motion to suppress.

And I will say that, even if I didn't find this affidavit was sufficient to lay out probable cause and be particular in describing the place and the items to be seized, it fits the good faith exception here, okay?

I also will note that how the Attachment B to the affidavit works, also it starts out with saying this is what Google captures. This is what the agents will be searching. And then these are the items that we will seize. It is very specific here.

So -- and then, as I said, I don't think it fits any of the exceptions here for the good faith in order for there not to be the reliance on the good faith rule.

I mean, it's clear that this affidavit -- you know, there are only four situations in which an officer's reliance on a search warrant would not be reasonable, and none of those fit here.

There's no allegation that Judge Vaala was misled by false information or that she abandoned her neutral judicial role.  Nor can it be said that the warrant was so lacking in any indicia of probable cause as to render the agent's belief in its existence entirely unreasonable.  I mean -- or the officer's belief in its existence unreasonable.  It was extensive.  I think it's sufficiently set out probable cause for the reasons I laid out, and so we can't say it's so facially deficient here, okay?

So I'm denying the motion to suppress.  Your exceptions are preserved.

I will look at the issue on your motion to dismiss and issue a written decision on that, and then I will expect you all to meet and confer once again -- oh, did you have something else?

MS. ULLERY:  No.  I -- he told me -- I thought I was supposed to stand because you were addressing me.

THE COURT:  I was looking at you because these were your motions as well, but you don't necessarily have to stand.  Was there anything else?

MS. ULLERY:  No, Your Honor.  Thank you.

THE COURT:  Anything from the government?

MR. HOOD:  No, Your Honor.

THE COURT:  Okay.  Nice job on your first appearance.

MS. ULLERY:  Thank you.

THE COURT:  Okay.  We're adjourned.

(Proceedings adjourned at 12:06 p.m.)

**C E R T I F I C A T E**

I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Scott L. Wallace                    1/11/25

------------------------------          ----------------
**Scott L. Wallace, RDR, CRR                Date**
   **Official Court Reporter**